**THE PLOW CITY.**

No. 7648.

Circuit Court of Appeals, Third Circuit.

Sept. 11, 1941.

Otto Wolff, Jr., of Philadelphia, Pa. (Lewis, Wolff, Gourlay & Hemphill, of Philadelphia, Pa., on the brief), for libellant-appellant.

George E. Beechwood, of Philadelphia, Pa. (Conlen, LaBrum & Beechwood, and James S. Benn, Jr., all of Philadelphia, Pa., on the brief), for appellees.

Before BIGGS, CLARK, and JONES, Circuit Judges.

BIGGS, Circuit Judge.

The libellant and appellant, Texas Gulf Sulphur Company, shipped a quantity of sulphur from Galveston, Texas, by S. S. "Plow City," to be delivered at Norfolk, Virginia, in the same good order and condition in which it was received. The Plow City was under charter to International Freighting Corporation, Inc., and the shipment was made pursuant to a contract between libellant and the latter company. The libellant, however, accepted a bill of lading from the master of the Plow City which incorporated the provisions of the Harter Act, 27 Stat. 445, 46 U.S.C.A. §§ 190—195. The bill of lading purported to except the ship and its claimant from liability for damages arising out of "* * * Perils of the Sea. * * * Accidents of Navigation, or latent defects, in, or accidents to, Hull, and/or Machinery, and/or Boilers * * * even when occasioned by the negligence, default or error in judgment of the * * * Master, Mariners or other persons employed by the Shipowner, or for whose Acts he is responsible, not resulting, however, in any case from want of due diligence by the Owner of the Ship, or by the Ship's Husband or Manager * * *." The bill of lading also incorporated all the terms and exceptions contained in another charter party between American Range Lines, Inc., and International Freighting Corporation, Inc., which excepted "Perils of the Sea, * * * Barratry of Master and Crew, * * * Accidents of Navigation * * * even when occasioned by negligence, default or error in judgment of the Pilot, Master, Mariners or other Servants of the Shipowners." The charter party expressly warranted that the Plow City was "* * * tight, staunch and strong, and in every way fitted for the voyage * * *" and was "* * * to be maintained in such condition by the owners during the voyage."

The Plow City left Galveston on October 10, 1937, ran into a storm on October 16th and 17th, and on the morning of October 17th was observed to be down at the head. An immediate inspection disclosed that there was sea-water in the No. 1 cargo hold, in which some of the libellant's cargo had been stowed. The master of the vessel proceeded to put into the port of Savannah, sixty miles distant, reaching it without further incident. The Plow City arrived at Savannah on October 18, 1937. A few days later, after certain repairs had been made, the vessel left Savannah under a temporary certificate of seaworthiness and proceeded to Norfolk, arriving on October 23rd. She discharged her cargo of sulphur at that port and proceeded to Chester, Pennsylvania, arriving on November 1, 1937. She was then

put in a drydock of the Sun Shipbuilding and Dry Dock Corporation and was examined and repaired.

The amended libel asserts that by reason of the defective and unseaworthy condition of the Plow City she did not deliver her cargo of sulphur at Norfolk in the same good condition in which she had received it at Galveston. In its answer the Plow City and the Plow City Steamship Company as claimant of the vessel asserted that the vessel on October 15, 1937, while on voyage from Galveston to Norfolk, "encountered unusually strong winds and rough seas, which caused her to roll heavily and labor greatly, so that her decks were constantly awash"; denied that damage to the sulphur had been caused or contributed to by any fault or neglect of the Plow City or her claimant; and set forth as a separate defense the exceptions from liability which we have referred to. The District Court held that the Plow City was not unseaworthy and that the damages claimed in the libel were due to one of the excepted perils of the contract of affreightment. The appeal at bar followed.

The evidence shows that on the afternoon of October 17th the mate went forward and discovered that the sounding pipe cap of the No. 1 sounding pipe within the mast-stand was missing; that the mate stopped up the pipe with a plug of wood and the vessel proceeded to Savannah. The water could have entered the No. 1 bilge through the No. 1 sounding pipe and overflowed thence into the No. 1 hold through the open grating between the bilge and the bottom of the hold. There was also evidence that the gaskets on two manhole covers were defective, which would have permitted water to come into the hold from a cofferdam which had become flooded. During the height of the storm, according to the ship's log as testified to by the captain, the wind velocity was Force Eight on the Beaufort Scale. This was at a rate from 34 to 40 miles an hour and the seas were high.

The repairs made to the Plow City at Chester included the rethreading of sounding pipes including the sounding pipe to the No. 1 bilge. In fairness, however, it should be pointed out that the Sun Shipbuilding and Drydock Company was instructed to renew every part of the ship which was "in the least defective."

■ The question presented for our determination is a very simple one. There was a warranty by the shipowner that the Plow City was seaworthy at the beginning of the voyage. A vessel which takes in such quantities of water as to put her down at the head a few days after leaving port cannot be presumed to have been seaworthy when she left port. That fact must be affirmatively proven. The Edwin I. Morrison, 153 U.S. 199, 210, 14 S.Ct. 823, 38 L.Ed. 688; The Medea, 9 Cir., 179 F. 781. The owner therefore had the burden of proving that the Plow City was seaworthy when she departed from Galveston. The learned District Judge found that the vessel was seaworthy, but this was based upon nothing more than his conjecture that the No. 1 sounding pipe and its cap "* * * were not so defective as to render the vessel unseaworthy * * *." He went on to say, "Whether the cap was displaced by the motion and straining of the vessel, or was missing due to the failure of some person to replace, is unimportant for present purposes inasmuch as both causes come within the exemptions of the Harter Act and the charter party agreement." There is no evidence that any person failed to replace the missing cap. On the other hand there is testimony tending to prove that the thread upon the No. 1 sounding pipe and the thread of its cap were defective so that the cap was dislodged by the pitching of the vessel, permitting water to enter the No. 1 bilge through the sounding pipe. This defective condition of threads upon pipe and cap, if it existed at all, must have existed at Galveston where the vessel lay only a few days before encountering the storm. If a shipowner warrants his vessel to be "tight, stanch, strong, and in every way fitted for the contemplated voyage," his vessel must be so equipped as to withstand the buffeting of a forty mile gale. The Edwin I. Morrison, supra, 153 U.S. at page 210, 14 S.Ct. 823, 829, 38 L.Ed. 688; The Medea, supra, 179 F. at pages 787 to 792, and authorities therein cited. Under the circumstances the loss of the cap may not be attributed to the perils of the sea and the shipowner cannot avail itself of the exceptions to liability as set up in the bill of lading and the charter party.

■ The appellees urge that the libel should have been dismissed because it was not brought by the real party in interest, contending that the appellant has received payment for its losses from the underwriters, Fidelity Phoenix Fire Insurance Company. This is not the fact. The libellant's underwriter did not pay its losses

within the terms of the policy, but gave the appellant the sum of $7,420.63 as a loan which was repayable in the event and to the extent that the appellant recovered against any third party for the damage to the goods in transit. The receipt is similar to that which the Supreme Court passed upon in the case of Luckenbach v. McCahan Sugar Refining Co., 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170, 1 A.L.R. 1522. See, also, Automobile Insurance Co. v. Springfield Dyeing Co., 3 Cir., 109 F.2d 533, 537. The fact that the Plow City was a contract rather than a common carrier is of little significance since there is no doubt that the insurer is liable upon its insurance contract.

The docket entries which are set out in the margin of this opinion as a footnote [1] show that the trial of this case was commenced upon March 2, 1939, was not concluded until December 7, 1939, and was subjected to no less than four adjournments in a period of nine months. One of these was for three months and another for five. These repeated adjournments were not taken at the request of counsel and witnesses were available for a speedy hearing of the case. The responsibility for the delays, adjournments and postponements must therefore rest upon the trial judge. To conduct in this desultory manner over a period of nine months a trial which ought not to have consumed ten days is an abuse of judicial discretion on the part of the trial court which this court cannot overlook. Public policy demands that, in the interest of the prompt and efficient administration of justice, a trial once entered upon should be proceeded with from day to day until it is concluded, unless the exigencies of the cause or the public interest imperatively require a reasonable adjournment.

The claimant submitted requests for findings of fact and conclusions of law. In attempting to carry out the duty imposed upon it by Admiralty Rule 46½, 28 U.S.C.A. following section 723, the trial court stated, "The respondent has requested specific findings of fact, the essential substance of which are included in our discussion of the circumstances on which our conclusion is based. For the purposes of the record,

however, the court affirms the respondent's request for findings of fact as presented *insofar as they are not at variance with the findings and discussions of facts herein * * *.*" We have italicized that portion of the quotation to which we desire to direct particular attention. Such a method of fact finding lacks clarity and coherence and does not comply with Rule 46½. Findings of fact should be clear, coherent and self-sustaining.

The decree of the court below is reversed and the cause is remanded with directions to ascertain the damages sustained by the libellant and to enter final judgment for the libellant in such sum, with costs to the libellant.

---

[1] "Mar. 2, 1939. Trial-witnesses sworn.
Mar. 3, 1939. Trial resumed.
Mar. 7, 1939. Trial resumed.
June 19, 1939. Trial resumed.
Nov. 27, 1939. Trial resumed.
Nov. 28, 1939. Trial resumed.
Nov. 29, 1939. Trial resumed.
Nov. 30, 1939. Trial resumed.
Dec. 6, 1939. Trial resumed.
Dec. 7, 1939. Trial concluded. Argument date to be fixed."