**HUILEVER, S. A. DIVISION HUILERIES DU CONGO BELGE et al. v. THE OTHO et al., and four other cases.**

No. 118.

Circuit Court of Appeals, Second Circuit.

Jan. 5, 1944.

Hunt, Hill & Betts, of New York City (John W. Crandall, George Whitefield Betts, Jr., and Helen F. Tuohy, all of New York City, of counsel), for appellants.

Maclay, Lyeth & Williams, of New York City (J. M. Richardson Lyeth, Mark W. Maclay, and Robert L. Fay, all of New York City, of counsel), for certain appellees.

Hill, Rivkins & Middleton, of New York City (Robert E. Hill and Thomas W. Geary, both of New York City, of counsel), for appellees.

Before SWAN, AUGUSTUS N. HAND and CHASE, Circuit Judges.

SWAN, Circuit Judge.

This appeal brings up for review interlocutory decrees in five suits by owners of cargo carried by the steamship Otho on a voyage which began at Freetown, West Africa, on December 27, 1940 and ended at the port of New York on January 17, 1941. The Otho is a vessel of the Isherwood design built in 1920. She arrived at the home port with 23 feet of sea water in the No. 1 hold. There was also damage to palm oil in the deep tanks and to cargo in the No. 2 hold and 'tween decks and in the bridge deck. The total damages claimed aggregate $514,420. The water in the No. 1 hold had entered through a crack 3 feet 7½ inches long, which developed during the voyage, in the third plate in the starboard H strake. The crack was along the line of the upper edge of the fifth longitudinal frame above the tank tops. It extended completely through the plating and was 7 feet below the water line. At the edges of the crack the plate whose original thickness was one-half inch had been wasted and thinned by corrosion to about one-eighth of an inch. At the trial the respondents contended that the loss of and damage to cargo resulted from perils of the sea and that they were protected from liability by the terms of the bills of lading and the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304(2) (c). But the court found the H-3 starboard plate was cracked and leaking sea water into the No. 1 hold before the Otho encountered the severe storm of January 11, 1941; that she was unseaworthy with respect to this plate when she sailed from New York in October 1940 and when she started her return voyage in December; that her owner had failed to exercise due diligence to make her seaworthy, and the crack in the hull plate resulted from such lack of diligence rather than from perils of the sea. The Otho, D.C., 49 F.Supp. 945. The correctness of these findings of fact is the main issue presented by the respondents' appeal.

■ The finding that the plate cracked under the stress of ordinary seas and weather by reason of its weakened and wasted condition from corrosion and panting is clearly supportable. On December 30, three days after leaving Freetown and long before any severe weather was encountered, an unusual amount of water was found in the starboard bilge of the No. 1 hold. Pumping of the starboard bilge continued daily thereafter. On January 4th water appeared in the port bilge of No. 1 hold and this bilge was also pumped daily thereafter. No reasonable explanation other than the cracked plate has been suggested for the presence of excessive water in the No. 1 bilges; the bilges of the other holds showed only a normal amount of water before the storm. The District Court's inference that the plate was fractured sufficiently to admit water long before the storm and that the fracture gradually lengthened until by January 13th the vessel was down by the head is reasonable and is supported rather than contradicted, as the appellants argue, by Tour's opinion testimony.

■ The finding that the owner of the Otho failed to exercise due diligence to make her seaworthy must likewise be supported, unless clearly erroneous. Petterson Lighterage & Towing Corp. v. New York Central R. Co., 2 Cir. 126 F.2d 992; Balfour, Guthrie & Co. v. American-West African Line, 2 Cir., 136 F.2d 320. We cannot say the finding is clearly wrong. In October 1940 Captain Sparrow, the owner's marine superintendent made merely a visual inspection of the No. 1 hold while standing on the tank tops. The crack occurred along the line of the upper edge of a longitudinal which was about 12 feet above the tank tops. Plainly his inspection was not of a character to discover the defect in the plate which later fractured. Mr. Gledhill's examination of the hold was, by stipulation, substantially the same as Captain Sparrow's. The inspection of the American Bureau surveyors was even less adequate as no examination was made of the interior shell plating of hold No. 1. Captain Paul's examination, which the trial judge found insufficient, is not impressive. It is difficult to believe that an inspection adequate to detect grooving along the lines of the longitudinals was had while the cargo battens were left in place. Nor does Captain Paul appear to have been familiar with the type of fracture likely to occur in the plating of Isherwood ships. Moreover, his written report stated that the plates were neither drilled nor hammer tested, although he gave some oral testimony as to using his hammer. It was for the trial judge to determine how far to trust the credibility and competence of this witness. The testimony of chief officer Printzlau may be disposed of on the same principle. The trial judge did not believe that he made a thorough and efficient in-

spection of hold No. 1 while the vessel was at sea between Matadi and Lagos; and the log books contain no mention of the scraping, wire-brushing and painting of hold No. 1 although similar entries as to other compartments of the ship were recorded.

It is urged that the defects, if any, in the H-3 plate were latent defects not discoverable by due diligence, but the record does not bear out this contention. Shortly after the vessel's return to New York, Mr. Narter made a thorough examination of the hold and was able by using his flash light and hammer "and digging around along the heels of the longitudinal frames" to discover badly grooved plates other than the one that had fractured. There is also testimony that the conditions of corrosion observable in the H-3 plate after its removal from the ship must have resulted from corrosion over a period of years and existed before the Otho's outbound voyage in October 1940. Hence it was not unreasonable to infer that the defect could have been detected by the exercise of greater care in examining hold No. 1 before commencement of the voyage in question.

The foregoing discussion should make it apparent that the findings of fact which the appellants challenge are not so clearly erroneous that an appellate court would be justified in setting them aside. In so holding we are applying the same rule as in the case of the Otho's sister ship the Zarembo, although there the ship was exonerated because the trial judge found that the owner had used due diligence to make her seaworthy. The Zarembo, D.C., 44 F.Supp. 915, affirmed sub nom. Balfour, Guthrie & Co. v. American-West African Line, 2 Cir., 136 F.2d 320. Although perhaps unfortunate and necessarily disappointing to litigants, it is inevitable that different trial judges, like different juries, may reach opposite results on facts which are similar or even apparently identical. But no' appellate court can assure uniformity in the decision of issues of fact. The credibility and persuasiveness of witnesses and the weight to be accorded to their testimony is for the fact finding tribunal.

On the facts as found there can be no question as to the respondents' liability for water-damaged cargo in the No. 1 hold and 'tween decks or for jettison of part of the palm oil to relieve the dangerous situation caused by the vessel being down by the head.

It is urged that the other claimed damage to cargo is not causally related to the fracture of the shell plating. Such damage falls into four categories: (1) Contamination of the remainder of the palm oil in the deep tanks by the leakage of sea water through loosened rivets in the way of the tanks and by the escape of steam from a leak in the steam heating coils. The loosening of rivets and the leak in the heating coil the appellants ascribe to straining in the heavy seas. (2) Sea water damage to cargo in No. 2 hold and 'tween decks. On January 12th the ship's launch was broken in half by the seas, and the after-half pounded about the deck and ripped the tarpaulins of the No. 2 hatch, permitting sea water to enter the hatch and come into contact with the cargo stowed therein. (3) Sweat damage to cargo in the wings of No. 2 'tween decks. On the morning of January 12th two ventilators were unshipped and the stumps were blocked with wooden plugs and canvas on account of the storm. (4) Sea water damage to peppers stowed in the bridge deck, the doors of which were sprung by the heavy seas on January 12th. The District Judge held that all of the damage was caused or contributed to by the unseaworthiness of the Otho resulting from want of due diligence. See findings of fact Nos. 56, 71, 72 and conclusions of law No. 8. We think these findings are supportable. Although the ship was not reported to be down at the head until the morning of January 13th, the log (exhibit W) records that her fore decks were awash during the morning of January 11th, despite the fact that the weather did not become severe until midnight of the 11th. Moreover, from 9 A. M. of that day the No. 1 bilges required continuous pumping. It is a permissible inference that the water in the hold was sufficient to cause the ship to be sluggish and to suffer more severely from the heavy seas of the 12th than might otherwise have been the case. Hence the findings that her unseaworthiness caused or contributed to damage to the cargo are not clearly erroneous.

In his opinion [45 F.Supp. 951] Judge Hulbert remarked that "the facts have not been sufficiently developed to enable me to make * * * an apportionment of the damages from the several causes contribut-

ing thereto." The opportunity to make such apportionment, if possible, will still be open to the appellants upon the reference ordered for computation of damages. See The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373; Ore Steamship Corp. v. D/S A/S Hassel, 2 Cir., 137 F.2d 326, 329. The decree is affirmed.