ARTEMIS MARITIME CO., Inc., et al. v.
SOUTHWESTERN SUGAR &
MOLASSES CO., Inc.

**THE DEMOSTHENES.**

No. 6203.

United States Court of Appeals
Fourth Circuit.

Argued April 4, 1951.

Decided May 11, 1951.

Thomas M. Johnston and Leon T. Seawell, Norfolk, Va., for appellants.

George L. Varian, New York City (John W. Oast, Jr., Norfolk, Va., and Crowell & Rouse, New York City, on brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Southwestern Sugar and Molasses Company, Inc., (hereinafter called Southwestern) brought a libel in admiralty, in the United States District Court for the Eastern District of Virginia, against the Panamanian Steam Tanker Demosthenes and the Artemis Maritime Company, Inc., (hereinafter called Artemis), her owner. Southwestern sought to recover damages for alleged loss due to contamination of certain molasses, the value of a part of the cargo of molasses, which had been jettisoned and a refund of portions of the freight charges paid by Southwestern to Artemis.

The District Court, after hearing the evidence, rendered an opinion concluding that Southwestern should recover the damages it sustained by reason of the contamination and jettison of the cargo of molasses. The District Court also entered conclusions of law and findings of fact, together with an interlocutory decree sustaining the claims of Southwestern and referred the case to Hugh Meredith, as Special Commissioner, to compute the damages sustained by Southwestern. Artemis has appealed to us from this interlocutory decree. The opinion of the District Court is reported in 92 F.Supp. 631, 1950 A.M.C. 2054.

On December 10, 1948, Southwestern chartered the Steam Tanker Demosthenes from Artemis for a period of eight and one-half months. During this time the Demosthenes made a total of sixteen voyages, carrying molasses cargoes. Within several days of the expiration of the said time charter, on August 26, 1949, Southwestern again chartered the Steam Tanker Demosthenes, this time for one round voyage from New Orleans, Louisiana, to Neuvitas, Cuba, to Norfolk, Virginia.

The Demosthenes sailed from New Orleans on or about the 27th. day of August, 1949, for Neuvitas; en route she received a radiogram ordering her to proceed to Banes, Cuba, to load her cargo. She complied with these instructions. After loading a molasses cargo of about 4,850 tons, the Demosthenes left Banes on September 7, 1949, at approximately 7:30 A.M. in fair weather and proceeded westerly along the northern coast of Cuba and through the Florida Straits bound for Hampton Roads, Virginia.

According to the District Court's finding of fact No. 10: "After loading was completed the Demosthenes sustained breakdowns of anchor windlass, rudder wheel gear and steering engine and as a result thereof was unable to depart until temporary repairs were performed by her crew."

It seems that no mention of these breakdowns was made in the vessel's log but Kostanos, Master of the Demosthenes, attributed this delay to "loss of tide."

On the morning of September 10, 1949, the Demosthenes ran into heavy weather off the Florida coast. The weather grew worse on September 11th and 12th, with waves breaking over the vessel's bow on all her sides and covering her weather deck.

Difficulties were experienced with the steering engine and rudder gear, which had been repaired just before the ship left Banes. These difficulties were aggravated by a thirteen-inch crack which developed in a wasted section of the bow plate on the port side of the vessel in the way of the chain locker. This crack admitted enough water to put the ship down by the head and interfered with her maneuverability. A large quantity of the molasses was jettisoned in order to avert the loss of the Demosthenes and her cargo.

On September 13, 1949, the weather improved and the voyage ended on September 15, 1949, when the vessel discharged her cargo at Portsmouth, Virginia. On September 24, 1949, after all cargo had been discharged, the Demosthenes moved to the plant of the Newport News Shipbuilding and Dry Dock Company for preliminary survey while afloat. This survey was attended jointly by representatives of Southwestern and the vessel owner, as well as by representatives of the American Bureau of Shipping, and Bruning, a surveyor retained by the Demosthenes. The Demosthenes was then found to be still making water copiously in the No. 1 cargo tanks, notwithstanding the installation of numerous additional cement patches, and as it was impossible to pump the vessel dry, drydocking for bottom survey was required.

This final survey was held on drydock on December 9, 1949, and on subsequent dates, but neither Southwestern nor its proctors were notified of such survey nor afforded an opportunity to be present at the survey although notice had previously been given to the vessel's proctors of a request to be advised of the time and place of said survey.

The report of the American Bureau of Shipping subsequently issued under date of December 30, 1949, disclosed:

"(a) 65 rivets in the way of No. 1 port and starboard cargo tank seams between the keel plate and 'A' Strake were found started and wasted excessively;

"(b) in the way of the chain locker on the port bow of the vessel, a severely wasted plate was found, which had worn thin, and cracked for a distance of thirteen inches."

Temporary repairs were thereafter effected and the Demosthenes sailed from Norfolk, Virginia, on December 20, 1949, for Piraeus, Greece, where she remained laid-up to the date of trial.

Pertinent provisions of the charter read:

"1.  Warranty. *The owner shall, before and at the commencement of the voyage, exercise due diligence to make the vessel seaworthy,* properly manned, equipped, and supplied for and during the voyage * * and to make the tanks, holds, and other spaces in which cargo is carried fit and safe for its carriage and preservation." (Italics ours.)

"23(b).  The Owner and the vessel in all matters arising under this Charter Party or any bill of lading issued hereunder shall be entitled to the like privileges, rights and immunities as are contained in Sections 3(6), 4, and 11 of the Carriage of Goods by Sea Act of the United States approved April 16, 1936."

The Carriage of Goods by Sea Act, Section 4, 46 U.S.C.A. § 1304 provides:

"§ 1304.  *Rights and immunities of carrier and ship—Unseaworthiness.*

"(1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied, * * *. *Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier* or other persons claiming exemption under this section." (Italics ours.)

The heart of this case is the District Judge's conclusion of law number two which reads: "The Demosthenes was unseaworthy at the time she broke ground at Banes, Cuba, on September 7, 1949, upon commencement of the voyage in question, and had been unseaworthy for some time prior thereto, in respect of her hull, all of which conditions could have been ascertained by the exercise of due diligence, and the jettison and damage to the molasses, the

said vessel's cargo, was the result of such unseaworthy conditions."

█ Whether Artemis exercised due diligence to make the vessel seaworthy is a question of fact. We can, accordingly, reverse the District Court here only if we hold the District Court's finding was clearly erroneous. We cannot so hold, therefore the judgment of the District Court must be affirmed.

Quite germane here is the opinion of Circuit Judge Swan, in a case somewhat similar to the case before us, Huilever, S. A. Division Huileries Du Congo Belge v. The Otho, 2 Cir., 139 F.2d 748, 749, 750:

"The finding that the owner of the Otho failed to exercise due diligence to make her seaworthy must likewise be supported, unless clearly erroneous. * * *

"It is urged that the defects, if any, in the H–3 plate were latent defects not discoverable by due diligence, but the record does not bear out this contention. Shortly after the vessel's return to New York, Mr. Narter made a thorough examination of the hold and was able by using his flashlight and hammer 'and digging around along the heels of the longitudinal frames' to discover badly grooved plates other than the one that had fractured. There is also testimony that the conditions of corrosion observable in the H–3 plate after its removal from the ship must have resulted from corrosion over a period of years and existed before the Otho's outbound voyage in October, 1940. Hence it was not unreasonable to infer that the defect could have been detected by the exercise of greater care in examining hold No. 1 before commencement of the voyage in question."

See, also, Bradshaw v. The Virginia, 4 Cir., 176 F.2d 526, 529; Isthmian Steam Ship Co. v. Martin, 4 Cir., 170 F.2d 25, 26; The Scow No. 27, 4 Cir., 164 F.2d 778, 779; The Bill, D.C., 47 F.Supp. 969, Id., 4 Cir., 145 F.2d 470.

█ Proof that seawater entered the cargo tanks raises a presumption of "unseaworthiness" which the vessel appellant here must rebut by producing clear proof that the loss and damage did *not* result from failure to exercise due diligence to make the vessel seaworthy in fact, and that it *did* result from a peril of the sea. This heavy burden is not carried if the issue is left in doubt.

Said Circuit Judge Frank, in Wessels v. The Asturias, 2 Cir., 126 F.2d 999, 1001: "Proof of the presence of sea water, it cannot be disputed, raises a presumption of unseaworthiness which the carrier must rebut."

And, in Commercial Molasses Corporation v. New York Tank Barge Corporation, 314 U.S. 104, 109, 62 S.Ct. 156, 160, 86 L.Ed. 89, Chief Justice Stone stated: " * * * since the burden is on the shipowner, he does not sustain it, and the shipper must prevail if, upon the whole evidence, it remains doubtful whether the loss is within the exception."

See, also, The Folmina, 212 U.S. 354, 29 S.Ct. 363, 53 L.Ed. 546; Metropolitan Coal Co. v. Howard, 2 Cir., 155 F.2d 780, 783, 784; The Plow City, 3 Cir., 122 F.2d 816, 818; The Glasgow Maru, 2 Cir., 102 F.2d 450; The Bill, D.C., 47 F.Supp. 969, 976.

█ The excepted "peril of the sea" does not come into play merely upon proof that the vessel encountered heavy seas and high winds, if the weather encountered might reasonably have been anticipated and could have been withstood by a seaworthy vessel. In the Plow City, 122 F.2d 816, 818, Circuit Judge Biggs stated: "In its answer the Plow City and the Plow City Steamship Company as claimant of the vessel asserted that the vessel on October 15, 1937, while on voyage from Galveston to Norfolk, 'encountered unusually strong winds and rough seas, which caused her to roll heavily and labor greatly, so that her decks were constantly awash'; * * * *A vessel which takes in such quantities of water as to put her down at the head a few days after leaving port cannot be presumed to have been seaworthy when she left port. That fact must be affirmatively proven. The Edwin I. Morrison, 153 U.S. 199, 210, 14 S.Ct. 823, 38 L.Ed. 688; The Medea, 9 Cir., 179 F. 781.*" (Italics ours.)

Circuit Judge Learned Hand, in Societa Anonima Cantiero Olivo v. Federal Insurance Co., 2 Cir., 62 F.2d 769, 771, said:

"* * * gales are likely at all seasons in the Atlantic, and this was at most not more. She should have been able to withstand it, else she was not reasonably fit for the duties she had undertaken, and was therefore not seaworthy. The Silvia, 171 U.S. 462, 464, 19 S.Ct. 7, 43 L.Ed. 241; The Southwark, 191 U.S. 1, 8, 9, 24 S.Ct. 1, 48 L.Ed. 65."

See, also, the statement of District Judge Leibell, in Middle East Agency v. The John B. Waterman, D.C., 86 F.Supp. 487, 489: "The vessel was unseaworthy in that the steel covers of the two deep tank hatches were not dogged down. The stormy weather was encountered off Cape Hatteras on March 25th and 26th. There were very heavy seas, a heavy rain squall and at times a wind force of 9 and 10 on the Beaufort Scale. But that kind of weather in the North Atlantic at that time of the year, The Schickshinny, D.C., 45 F.Supp. 813, at page 817, should have been anticipated in the stowage of this cargo. The damage was not due to the perils of the sea or an Act of God."

And, see, Edmond Weil, Inc., v. American West African Line, 2 Cir., 147 F.2d 363, 366; Petition of Howard, D.C., 53 F.Supp. 556.

■ Clearly the duty of the ship owner here is nondelegable. Huilever, S. A. Division Huileries Du Congo Belge v. The Otho, D.C., 49 F.Supp 945, 947, Id., 2 Cir., 139 F.2d 748, 750; The Bill, D.C., 47 F. Supp. 969; Philippine Refining Corporation v. United States, D.C., 29 F.2d 134, Id., D. C., 33 F.2d 974, Id., 2 Cir., 41 F.2d 1010. While various precautions have some evidentiary value, neither "visual inspection", Ore Steamship Corp. v. D/S. A/S. Hassel (The Cypria), 2 Cir., 137 F.2d 326, nor inspection of hull and machinery of the vessel, The Vizcaya, D.C., 63 F.Supp. 898, nor "diligence in the acquisition of seaworthiness certificates", The Folmina, 212 U.S. 354, 29 S.Ct. 363, 53 L.Ed. 546; The Abbazia, D.C., 127 F. 495, is conclusive as to the fulfillment by the vessel owner of his duty to exercise the requisite care. Bank Line v. Porter, 4 Cir., 25 F.2d 843. All the testimony, and all the surrounding facts and circumstances, must be considered.

■ The District's Judge's Finding of Fact No. 20 reads:

"Numerous surveys or inspections were made by or on behalf of Artemis prior to entering upon the charter but they were incomplete and failed to disclose the deteriorated and wasted-thin condition of the port bow plate in the way of the chain locker and of the excessively wasted and rusted condition of bottom rivets in the way of her cargo tanks. Reports of such surveys are in evidence."

We think this finding is amply supported by the record. Thus Addison, one of the surveyors for Artemis, testified as to his inspection of the Demosthenes in March and May, 1949, after the vessel had been aground for three days in Tampico Harbor:

"Q. Did you examine the vessel's bottom rivets on that occasion from the inside of the tanks, Mr. Addison? A. I didn't go inside the tanks.

"Q. So that you don't know the condition of the bottom rivets or any of the structural members in the tanks? A. That is correct, I was not interested in the internal condition.

"By the Court: Q. You say you were not interested in the internal condition of the tanks? A. I mean, that didn't come under my survey at that time, to examine the tanks internally."

Humble, another surveyor for Artemis, testified:

"Q. At the time you examined the Demosthenes, September 22, while the vessel was afloat, she was then, in your opinion, in an unseaworthy condition, was she not? A. Yes, sir.

"Q. And there is no question about that, is there? A. No, sir.

* * * * * *

"Q. I think you stated that you found the port bow plate in the way of the chain locker, which was 'J' Strake, in an excessively wasted condition? A. Locally.

"Q. Yes, locally. You examined that crack pretty closely, didn't you? A. From both inside and outside.

"Q. And you agree that it was a knife-edge crack, do you? A. Yes, sir.

"Q. What would make a crack knife-edged? A. The plate worn thin.

\*　　\*　　\*　　\*　　\*　　\*

"Q. So, if you didn't know it was there, a diligent inspection would disclose it? A. Yes, sir.

"Q. Now, can you tell, without a great deal of trouble, from your notes tell me how many wasted rivets you found in the area of No. 1 cargo tank? A. Approximately 65 that we dealt with.

\*　　\*　　\*　　\*　　\*　　\*

"Q. In your experience and from your knowledge of the subject, would a proper and diligent inspection of a vessel disclose wasted rivets? A. Yes, sir.

"Q. And, if it did not, would you say it was or was not a careful inspection? A. If it didn't find any, you mean?

"Q. No—if they were there and you did not find them. A. It was not a diligent inspection if they were there and you didn't find them.

"Q. In other words, a diligent inspection would necessarily reveal them, or otherwise the inspection was not sufficiently had? A. Yes, sir."

Cruikshank, also a witness for Artemis, agreed with Humble as to the unseaworthy condition of the vessel at Norfolk in September, 1949, with respect to the wasted condition of her bow plates and bottom rivets. He further testified that a leak he found in the vessel appeared to come from the bottom and could have been the result of slack and wasted rivets.

The Demosthenes was an old vessel, built in 1917. Christensen, American Bureau of Shipping Surveyor, called by Artemis, testified:

"Q. Mr. Christensen, I would like you to tell me whether it is fair to say that the older a ship gets, the more diligent you have to be to survey her and find wasted areas to prevent leaks? A. That's right."

Bruning, another Artemis witness, testified:

"Q. You found wasted rivets down in the No. 1 tank, didn't you? A. In some ways, yes, sir.

"Q. How many? A. Well, I guess probably fifty or sixty in that No. 1 tank.

"Q. Fifty or sixty rivets? A. Uh-huh; that is, loose and wasted.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Could the wasted condition of the rivets that you saw be detected by an examination from the inside of the tanks? A. Yes, sir, inside and out."

We are not deeply impressed by the testimony of Moates and Pillat on which Artemis relies heavily. There was some probative force in the "hammer test" made by Moates of the side plating of the vessel; but Moates inspected the vessel primarily for efficiency of operation rather than seaworthiness. He found the boilers and pumps in bad condition and the hull patched and pitted. Nor was he able to inspect the cargo tanks internally. Certainly the force of Pillat's testimony was weakened by his admissions: " \* \* \* The hull should be sighted all around, port and starboard. The tanks should be determined whether they are tight or not, excessive wastage and damage should be noted, which would require an internal examination of various tanks or spaces. And the vessel should be sighted on drydock for underwater inspection."

He did none of these things. On the contrary, he testified:

"At the time of the survey, I was not instructed to make a complete seaworthy examination of the hull or the vessel. If I were requested to give a seaworthy certificate in the name of my company, to satisfy myself, I would want to make a thorough examination of the vessel.

"Knowing there are several wasted areas, naturally I would pay a lot more attention to them than I did in the above mentioned survey."

The case for Artemis was not helped by certain entries in the vessel's log, by parts of the testimony of Kastanos, Master of the Demosthenes, by some of the evidence of

494

Surveyor Bencal and by the failure of Artemis to produce the vessel's bilge log. The Philadelphia L–1, 3 Cir., 44 F.2d 1; The Motor Launch No. 12, 65 F.Supp. 252, 1946, A.M.C. 669, 672.

Artemis relies heavily upon the cases of The Monte Iciar (Globe Distributing Co.) 3 Cir., 167 F.2d 334 and The Zarembo, D.C., 44 F.Supp. 915; Balfour, Guthrie & Co. v. American-West African Line, 2 Cir., 136 F. 2d 320. We find nothing in these cases contrary to the views we have set out. The Globe case was concerned primarily with a leakage exception in the bill of lading. See, The Folmina, 212 U.S. 354, 362, 29 S. Ct. 363, 53 L.Ed. 546; The Patria, 2 Cir., 132 F. 971, 972. The facts in the Zarembo case were quite different from those in the case at bar. And Circuit Judge Swan, in Huilever, S. A. Division Huileries Du Congo Belge v. The Otho, 2 Cir., 139 F.2d 748, 750, stated: "The foregoing discussion should make it apparent that the findings of fact which the appellants challenge are not so clearly erroneous that an appellate court would be justified in setting them aside. In so holding we are applying the same rule as in the case of the Otho's sister ship the Zarembo, although there the ship was exonerated because the trial judge found that the owner had used due diligence to make her seaworthy. The Zarembo, D.C., 44 F. Supp. 915, affirmed sub nom. Balfour, Guthrie & Co. v. American-West African Line, 2 Cir., 163 [136] F.2d 320. Although perhaps unfortunate and necessarily disappointing to litigants, it is inevitable that different trial judges, like different juries, may reach opposite results on facts which are similar or even apparently identical. But no appellate court can assure uniformity in the decision of issues of fact. The credibility and persuasiveness of witnesses and the weight to be accorded to their testimony is for the fact finding tribunal."

A careful study of the record before us discloses no reason for reversing the District Court's essential findings of fact and conclusions of law, which form an adequate basis for its decree. The decree of the District Court is, accordingly affirmed.

Affirmed.