The PRESIDENT OF INDIA, acting by and through the DIRECTOR OF the INDIA SUPPLY MISSION, Libelant,

v.

WEST COAST STEAMSHIP COMPANY, an Oregon corporation, Respondent.

Civ. 61–274.

United States District Court
D. Oregon.
Dec. 20, 1962.

John Gordon Gearin, of Koerner, Young, McColloch & Dezendorf, Portland, Or., for libelant.

Kenneth E. Roberts, of Mautz, Souther, Spaulding, Kinsey & Williamson, Portland, Or., for respondent.

KILKENNY, District Judge.

Libel in admiralty for damages by the owner of certain cargo which was lost or damaged while aboard the SS PORTLAND TRADER, a vessel owned by respondent and, at the time of the occurrence, operated under a certain Charter Party between libelant and respondent.

The TRADER was an ocean-going cargo vessel of the Liberty type purchased by respondent for a sum in excess of $500,000. The vessel was of 7,251 tons gross and 4,455 tons net, with a crew, including officers, of 38. The Charter Party was executed in October, 1960, and,

in accordance with its terms, approximately 9,800 long tons of bulk wheat in good order and condition was loaded aboard the TRADER at Vancouver, Washington, in December, 1960, for delivery to libelant in Calcutta, India. The TRADER departed on its voyage on that day and on or about the 5th day of January, 1961, while traversing the Sulu Sea, Republic of The Philippines, she came in contact with an undercropping of the Tubbataha Reef, which contact resulted in the propeller of the vessel being bent so that it would not pass the rudder. This occurred at approximately 0200. The vessel drifted free of the Reef for approximately 3½ hours, at which time it again struck the Reef and grounded. The master of the TRADER, one Hansen, had been employed by respondent for approximately 9 years prior to the casualty. This was his second voyage as master and his first voyage as master through the Sulu Sea. The vessel was equipped with neither radar[1] nor loran.[2] The Sulu Sea in which the damaging reef was located was, at the time of the occurrence, blanketed by loran signals from several transmitters. The TRADER was equipped with a radio direction finder, but there was no RDF coverage which blanketed the area through the Sulu Sea. This fact was known to the Captain and also to the respondent. The Captain had received training as a radar observer, obtaining his master's license in 1958. The A–1 classification given the ship by the American Bureau of Shipping does not carry with it anything with reference to elec-

1. A development of World War II whereby pulses of ultra-high frequency radio waves emitted by a transmitter aboard ship are reflected by solid objects and are detected upon their return by the sending station. It gives a visual picture of objects projecting above the surface of the sea, and affords the navigator a picture of nearby obstacles, such as ships and rocks, showing their range and bearing,

2. A system of radio navigation developed during World War II. It derives its name from "Long Range Aid to Naviga-

tion." High Frequency radio signals emitted simultaneously by two loran transmitter stations ashore, separated by about 400 miles, are received aboard ship in a loran receiver, which determines with a high degree of accuracy the difference in time at which the two signals are received. Curves printed on a navigation chart show loran lines of position for various time differences. In an area blanketed by loran signals, the navigator using the receiver can determine several lines of position. Their intersection gives him the location of his vessel.

tronic aids to navigation and does not indicate whether a ship has or does not have radar or other aids.

The official map of the United States Coast Guard & Geodetic Survey shows that at least as early as 1939 the very sea lane which was being followed by the TRADER was designated as a recommended steamer route through the Sulu Sea. These waters were known to be dangerous, but no more so than many other well recognized sea lanes throughout the world. For more than a century the lane has been recognized as one for sea traffic between the Hawaiian Islands and Singapore.

Some hours after another ship took the majority of the crew, the Captain and the remainder of the crew abandoned ship. This was approximately 6:00 p. m., ship's time. After the vessel grounded on the Reef, its hull was so damaged that sea water entered the cargo holds and the cargo sustained substantial damage. A salvaging operation saved a portion of the cargo which was later transferred to its destination.

The above statement although skeleton in nature, is sufficient to give an outline of the facts involved.

The only issue before the Court at this time is that of liability.

█ My ultimate conclusions must be governed by the Carriage of Goods by Sea Act, known as C.O.G.S.A., 46 U.S.C. §§ 1300–1315. Under the provisions of that Act the libelant here made a prima facie case by proving receipt by the TRADER of the goods in good order and the fact that the goods were damaged by the leakage of water into the hold of the vessel. From that point the TRADER must explain the reason for the damage to the goods.

## LIBELANT'S CONTENTIONS

Libelant contends that the loss and damage to the cargo was proximately caused by the unseaworthiness of the vessel and by the personal acts, defaults and negligence of respondent in the following particulars: (a) the vessel was unseaworthy in that it was not equipped with radar; (b) the vessel was unseaworthy in that it was not equipped with loran; (c) respondent permitted the master, who was unfamiliar with the area, to sail the vessel into and through the Sulu Sea, knowing the same to be dangerous waters when the vessel was not equipped with either loran or radar; (d) respondent failed to give the master specific instructions for making a safe voyage through the Sulu Sea; (e) respondent failed to take any precautions whatsoever to safeguard the cargo after it had been advised by radio communication that the vessel had damaged its propeller and was adrift; (f) respondent was further guilty of negligence in that prior to the instant voyage it deliberately chose not to equip the vessel with loran, knowing the probable route which the vessel would take, i. e., the Sulu Sea; and (g) respondent was further guilty of negligence in that prior to the instant voyage it deliberately chose not to equip the vessel with radar, knowing the probable route which the vessel would take, i. e., the Sulu Sea.

Respondent denies that the vessel was unseaworthy or that it was negligent, and affirmatively alleges that the vessel was seaworthy, that respondent was not negligent, that the vessel was seaworthy in all respects as required of respondent under the Charter Party, the Bill of Lading, the Contract of Affreightment and under the Carriage of Goods by Sea Act; that the casualty was occasioned without the privity or knowledge of the respondent, and that the casualty was the proximate result of a cause for which the respondent was not responsible, by reason of the Carriage of Goods by Sea Act,[3] the Bill of Lading, the Contract of Affreightment or the Charter Party, in

---

3. 46 U.S.C. § 1304.
"* * * (2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship; * * *."

that the act, default or neglect, or error of judgment, of the master, mariner, pilot or those in charge of the ship, was the sole cause of the disaster. Respondent charges that the master failed to maintain a proper lookout; failed to maintain a proper control of the vessel; navigated the vessel at a speed that was excessive, considering the conditions then and there attendant; attempted to locate an unlighted light tower on a reef in conditions of darkness and poor visibility; failed to stop the vessel; failed to await daylight hours before attempting to locate the unlighted light tower; navigated the vessel so as to cause her to strand; and turned the vessel from a safe position into the face of a known hazard.

## SEAWORTHINESS

The first question presented is whether the absence of radar, or loran, rendered the vessel unseaworthy and, if so, whether such unseaworthiness was the proximate cause of the damage to the TRADER. The evidence is clear that both radar and loran are valuable aids to navigation. The vessel was equipped with all navigational aids which had been commonly used over the centuries.

■ With the brilliant clarity of hind sight, it is now easy to rationalize how the disaster could have been avoided if the vessel had been equipped with either one of these modern aids to navigation. However, it is my duty to determine the seaworthiness of the vessel from the standpoint of the commencement of the voyage rather than measuring the standard by what happened at the time of the occurrence.

■ Although the duty to furnish a seaworthy ship is absolute and is a species of liability without fault, limited neither by concepts of negligence nor by those which might be contractual in nature, Seas Shipping Co. Inc. v. Sieracki, (1946) 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561; the obligation does not require the owner to furnish a ship or gear beyond that which is reasonably fit for the use intended. In other words, the standard is not an accident-free ship, nor an obligation to provide a ship or gear which might withstand all conceivable hazards. In the last analysis, the obligation, although absolute, means nothing more or less than the duty to furnish a ship and equipment reasonably suitable for the intended use or service. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed. 2d 941; Boudoin v. Lykes Bros. S.S. Co., Inc., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354; Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 81 S.Ct. 6, 5 L.Ed.2d 20.

■ Another statement of the doctrine is that the standard is not perfection but reasonable fitness. It does not require a ship which will weather every conceivable storm or withstand every imaginable peril of the sea, but only a vessel reasonably suitable for the particular service. Mitchell v. Trawler Racer, Inc., supra. In examining the facts in this case we must keep in mind that the ship owner's warranty of seaworthiness does not extend to the negligent use of what would otherwise be a seaworthy ship or appliance. Billeci v. United States, 298 F.2d 703 (9 Cir., 1962).

The overwhelming weight of the evidence in the case is that there is no worldwide or American practice or custom with reference to the use of radar or loran as aids to navigation. Improvements in the means and modes of navigation frequently require new implements or new forms of old ones, and these, though not necessary at first, become so when there is an established usage on ships of a certain quality, or those to be sent on certain voyages or used for certain purposes. The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65. Here, we have no well established usage. Some companies use radar or loran; others do not. The evidence shows that none of the hundreds of Liberty ships built during the war, originally carried either loran or radar. Some have been so

equipped in recent years. Most of those engaged in the tramp trade, such as the TRADER, were not so equipped. Libelant's proctor makes a vigorous, incisive and impressive presentation of his theory that the Court should follow the reasoning of Judge Learned Hand in The T. J. Hooper, 60 F.2d 737 (2 Cir.), and hold that either radar or loran or both were indispensible aids to the proper navigation of the TRADER on the particular voyage and that the absence of either one or both rendered the ship unseaworthy. The precise meaning and overall judicial effect of Judge Hand's decision in Hooper is in serious dispute in the Circuit of its origin. Nuzzo v. Rederi, 304 F.2d 506, 510 (2 Cir., 1962), and dissenting opinion of Judge Clark, 511. Be that as it may, I believe in Judge Hand's truism that the courts must in the end fix the standards of what is or is not a seaworthy ship.

It is interesting to note that Judge Hand, the author of The Hooper opinion, gives full recognition to the rule of law that advances in science, as such, do not make once seaworthy ships unseaworthy. It was his opinion that ships which were well built in their time might still carry cargo unless they became so clearly out of fashion as to be anachronism. Spang Chalfant & Co., Inc. v. Dimon Steamship Corp., 57 F.2d 965 (2 Cir., 1932). This case is cited with approval by then District Judge Skelly Wright in Hendry Corporation v. Aircraft Rescue Vessels, 113 F.Supp. 198 (D.C.La.1953), wherein Judge Wright held that the mere absence of a radio on a tug did not make her unseaworthy. Judge Wright's decision was over twenty years subsequent to the decision of Judge Hand in The Hooper case. Other cases indicating that the absence of radar does not, per se, render a ship unseaworthy are: Anglo-Saxon Petroleum Co. v. United States, 88 F.Supp. 158 (D.C.Mass.1950); Timur Fishing Corp. v. Cap'n Bill, Inc., 160 F.Supp. 563 (D.C.Mass., 1958).

■ We must start with a premise that both parties, under the undisputed evidence, were of the belief that the ship was sound in every respect and fit for the voyage. This fact, of course, is in no way controlling. Likewise, the opinion evidence, both libelant's and respondent's, although helpful, is highly disputed and, for the most part, touches on the very issue to be decided by the Court. The ultimate conclusion on seaworthiness is for the trier of the facts rather than experts. Salem v. United States Lines, (1962) 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313. In my opinion this is not one of the rare cases where the ultimate conclusion must be based on expert testimony. To arrive at a proper conclusion the Court must recognize that for thousands and thousands of years men went down to the sea in ships without navigational aids such as radar or loran. There was no general movement toward the use of this equipment until well after World War II and into the mid Fifties. With all of the time tested aids which a mariner has had available over the course of the years, can it now be said that his ship is made unseaworthy by reason of the absence of either radar or loran?

■■ It is clear that neither radar nor loran were ever meant to supersede or replace time honored navigational aids and naval equipment such as that with which the TRADER was equipped. This does not mean that the navigator may ignore or make improper use of radar equipment which he may have aboard and such misuse of radar may be a foundation for a finding of negligence leading to liability. Anglo-Saxon Petroleum Co. v. United States, supra. Without making a written analysis of all of the authorities cited by libelant and respondent, it is my considered judgment that the employment of radar, in connection with the navigation of tramp steamers under the facts and circumstances here in question, is still in a period of transition and at the time of this occurrence was not so essential to navigation that its absence would give rise to a finding of unseaworthiness. I make the same finding with reference to the absence of loran. That fact did not create an unsea-

worthy condition. I would be one of the first to recognize that in the not too distant future the absence of such navigational aids on such ships might well make them unseaworthy, and I take full and complete recognition of the rule that the standard of seaworthiness is not "condemned to inertia or rigidity, but changes 'with advancing knowledge, experience, and the changed appliances of navigation.'" The T. J. Hooper, D.C., 53 F.2d 107.

Likewise, under all of the facts in this case, I find that the master was a trained seaman with a sufficient background in the ways of the sea to justify respondent in placing the TRADER under his command and that the instructions given the master by respondent were sufficient for the intended voyage.

## NEGLIGENCE AND DUE DILIGENCE

■ The charges of negligence that respondent failed to equip the vessel with loran or with radar, knowing that the probable route of the vessel was through the Sulu Sea, must fail on essentially the same grounds as the failure to establish unseaworthiness by the absence of the same instruments. Under all of the evidence in this case, *viva voce* and otherwise, I find that respondent was not negligent in failing to equip the ship with radar or loran and that a reasonable prudent shipper, in the place of the respondent, would not, in January, 1960, have equipped this tramp steamer for this particular voyage with either of said aids to navigation.

■ Libelant's proctor makes an able argument in support of his charge that respondent was negligent in failing to instruct its master to take what he claims was the safer route north of Luzon. Libelant's argument is premised, in large measure, on the decision of the Ninth Circuit in States Steamship Co. v. United States, 259 F.2d 458 (9 Cir., 1957). Proctor points to the similarity in circumstances of the owner in States Steamship case knowing that the ship was setting out in what was the coldest month of the year on a route which was through an area where it was likely to encounter extreme cold and high seas and the knowledge of respondent in this case that the ship was proceeding through the waters of the Sulu Sea. In States Steamship the vessel was "crack sensitive" and the libelant compares that type of a ship with a ship lacking either radar or loran plying those waters and then charges the respondent with negligence on its failure to instruct the master not to go through that Sea but use the sea lanes to the north of Luzon. As part of his argument, counsel points to the fact that the PACIFIC TRADER, another vessel of respondent's, went aground in September, 1959 in the westerly part of the Sulu Sea. The undisputed evidence in this case is that the Master was familiar with that disaster and exercised his own discretion in taking the Sulu Sea route. Respondent did not attempt, in any way, to interfere with that discretion. The evidence shows that the Master traversed a recognized steamer route and had the same knowledge of the problems of that route as had the respondent. It is a general rule that where an owner has appointed a competent Master, such owner is entitled to rely on the Master's judgment in the navigation of the ship and should not hamper the further exercise of his judgment with instructions and orders. The G. K. Wentworth, 67 F.2d 965 (9 Cir., 1933); Denholm Shipping Co. v. Hedger, 34 F.2d 572 (2 Cir., 1929); The Oritani, 40 F.2d 522 (3 Cir., 1929). There is nothing in the record which would indicate that the respondent was under a duty to give specific or other directions to the Master to sail the ship north of Luzon. Substantial evidence would indicate, and I find, that a ship taking that route would encounter dangers just as great as a ship taking the regular steamer route through the Sulu Sea. Even the clarity of hind sight is of no help to respondent on this charge.

■ In all of my approaches to a solution of the problems involved in this cause, I have kept in mind and invoked

the general rule that under C.O.G.S.A., 46 U.S.C. §§ 1303, 1304, the burden of proof to establish seaworthiness or the exercise of due diligence is on the respondent, and, furthermore, the trier of the facts must be convinced beyond a substantial doubt that the vessel was in fact seaworthy and the owner free from negligence. The Indien, 71 F.2d 752 (9 Cir., (1934); The Daido Line v. Thomas P. Gonzalez Corp., 299 F.2d 669, 671 (9 Cir., 1962), and that doubtful issues must be resolved in favor of cargo. The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65; Artemis Maritime Co., Inc. v. Southwestern Sugar & Molasses Co., Inc., 189 F.2d 488 (4 Cir., 1951). I have no doubt that the TRADER was seaworthy in all respects and that the owner used due diligence and was free from negligence in equipping and manning the ship and has met the burden required under C.O.G.S.A.

▋ Respondent's claim that libelant, by reason of the provisions of the Charter Party, waived its right to claim unseaworthiness or want of due diligence is without merit. The particular form of Charter is known as a Voyage Charter in which a ship is engaged to carry a full cargo on a specific voyage. The vessel, in such case, is *manned and navigated* by respondent. Gilmore & Black, Admiralty (1957), p. 171. The certificate of seaworthiness would not, in itself, prove that the ship was seaworthy or defeat libelant's claim. Artemis Maritime Co., Inc. v. Southwestern Sugar & Molasses Co., Inc., 189 F.2d 488 (4 Cir., 1951); Bank Line Limited v. Porter, 25 F.2d 843, 845 (4 Cir., 1928). If, in fact, the TRADER was unseaworthy, certificates of surveyors and inspectors should be disregarded. I have not considered such certificates in arriving at my conclusions.

▋ Great importance, argues the libelant, should be placed on the fact that the ship's logs, other than the smooth log, were not produced in Court. The great weight of the evidence on this subject is that respondent made every effort, even to the extent of sending one of its officers to the Philippines, to recover these logs. The Master, in an attempt to conceal his lack of due care at or immediately before the grounding, might have had good reason to dispose of the missing logs. Conversely, the respondent would have no good reason for concealing, destroying, or failing to produce these logs. The rule which libelant attempts to invoke cannot be utilized under these circumstances.

## CARE OF CARGO

Aside from the negligence charged to respondent in connection with the grounding of the vessel the libelant argues, with considerable vigor, that respondent, after being advised of the disaster, improperly assumed control of the situation and, by giving unreasonable and restrictive directions to its Master, negligently permitted the vessel and her cargo from being towed to safety.

▋ It is conceded that respondent had a duty to exercise reasonable care and diligence in preserving the cargo from further damage after the grounding. The Willdomino, 300 F. 5 (3rd Cir., 1924); 266 U.S. 597, 45 S.Ct. 98, 69 L.Ed. 460, cert. granted; 270 U.S. 641, 46 S.Ct. 205, 70 L.Ed. 776, cert. dismissed as to cross libel; 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491, affirmed. 46 U.S.C. § 1303. Respondent, however, is not liable for the act, neglect or default of the Master of the TRADER in the navigation or in the management of the ship. 46 U.S.C. § 1304(2) (a).

A chronology of what occurred at and for sometime after the original contact with the Reef at 0200 (2 A.M.)[4] is as follows: 0341 the Master advised owners that the ship had struck a Reef and bent the propeller so that it would not pass the rudder, with the vessel adrift not under command but with no bottom on soundings. At 0359 the ship sent a

---

**4.** All references to ship's time.

message to the Manila agent to the same effect. At 0701 the owners in Portland received the message from the ship. At 0848 the ship sent a message to Iloilo advising that TRADER was lying along east side of Tubbataha Reef. At 0855 owners sent a message to ship, received by ship at 1201. At 0857 the TRADER sent an SOS indicating it required immediate assistance to remove crew. At 0955 the ship sent the first message to the owners which would indicate that the ship had drifted into and was pounding against the Reef and had developed a small fracture in the engine room. This message was not received by respondent until 1208. At the same time the ship sent a message to the Manila agents advising that the ship was pounding against the Reef, that the vessel was not taking water and that the vessel had an even keel with no list. At 1002 the Manila agents sent a message to the owners and at 1128 the Manila agents sent a message to the ship. At 1201 the ship received a message from the owners which was sent at 0855. At 1208 the owners received a message from the Master which was sent at 0955 which was the first message which indicated to the owners that the ship was in serious difficulty. Some twenty minutes later, at 1228, the ship sent another message to the owners which asked to advise an acceptable tug rate. This was not received in Portland until 1440. During this period the respondent attempted to call its agent in Manila and was in constant radio contact with said agent. The exchange started at 1415 ship's time and continued until 1600 ship's time, when respondent directed a message to the Master suggesting a daily tug rate of $2,000.00 but placed final judgment in the Master.[5] As late as 1807 the re-

spondent received a message from the ship advising that certain crew members were aboard the S. S. MARTITA and that the pumps were handling the water from the skin fracture in the engine room. In the meantime, the Master was in radio contact with the Master of the MARTITA on a towing rate and at 1449 the MARTITA advised the Master of the TRADER that it could not accept daily towing rates in response to which the Master of the TRADER gave thanks to the MARTITA for taking the crew. Libelant makes much over the fact that at 1458 the Master of the TRADER sent a message to the NASSA in which he offered $3,000.00 per 24 hours to take the TRADER in tow. At 1502 the final message was received from the MARTITA that it would be on its way. As late as 1519 a message from the TRADER to the NASSA indicated that the engine room was taking only a small amount of water.[6] To be kept in mind, at all times, is the fact that there was a transmission delay in the radio messages between the ship and Manila and the West Coast of from 3½ to 4 hours. The most urgent message received by respondent was the one advising that 28 men were transferring to the MARTITA, this message being sent at 1332, a short time before the arrival of the MARTITA, which message was not received by respondent in Portland until long after respondent sent the message at 1600.

When the salvage tug STINGRAY arrived the vessel was still pounding on the Reef and the tug at that time towed the vessel to a sheltered position where repairs were made so that she might later be towed to a salvage station.

 At the trial the Master was very positive in his testimony that at the

---

5. "Messages acknowledged First concern safety you and crew Seapost Manila has arranged tugs with salvage equipment on daily hire for towing purposes only but if salvage required Lloyd's no cure no pay agreement ETA AM 8 Stop However small tug also dispatched from Iloilo ETA Noon 6 Stop Suggest you keep Post contact Seapostes Manila. How-

ever, if necessary engage tug or other vessel prior arrival dispatch tug suggest daily rate $2,000 or best terms depending on condition but your judgment must govern Stop Acknowledge and keep us advised fully."

6. " * * * am taking water engine room slightly, pumps handling O.K. * * *"

time of the arrival of the MARTITA, the TRADER had suffered so much damage to her hull that it would be a dangerous procedure to accept a line. He testified that he was deeply concerned over the fact that the MARTITA had no salvage equipment aboard and that he desired a Lloyd's open salvage agreement because he was under an obligation to look after the company's interests and the charterer's interest as well as his own. It is difficult to reconcile this testimony with the Master's offer to the NASSA at 1458 of $3,000.00 to take the vessel in tow until the arrival of the salvage tug. Evidently he had difficulty in arriving at a conclusion on whether to accept the line and possibly founder in deep water, or permit the ship, with comparative safety, to remain grounded on the Reef. Obviously, the Master was confronted with an extremely difficult decision. His inconsistent actions must be analyzed in the light of the emergency with which he was faced, even this be of his own making. The admitted fact that a large quantity of the cargo was salvaged is strong evidence of the wisdom of permitting the TRADER to remain on the Reef until the arrival of the tug. A careful examination of the testimony on the subject and of all of the messages forces me to the inevitable finding: (1) that on the basis of the knowledge at hand respondent acted as a reasonable, prudent, shipowner would act under like circumstances and conditions, (2) that, with the knowledge at hand, respondent did not give the Master unreasonable or restrictive directions, (3) that the Master exercised his own discretion on whether to accept a tow, and (4) that the sole proximate cause of the damage to the cargo was the negligent acts of the Master prior to and at the time of grounding on the Reef, rather than the acts, omissions or commissions of either the Master or respondent after said grounding.

## PROXIMATE CAUSE

At Negros Island on entering the Sulu Sea, the Master obtained a definite fixed position from which he set a course which he estimated would eventually place him on a dead reckoning basis approximately three miles south of Tubbataha Reef. The Master was attempting to locate the Reef in order to secure a definite fix before sailing through the waters of the Balabac Straits, some considerable distance to the west. This dead reckoning was based on the course the vessel steered and its average speed of 11.5 knots. Some 13½ hours later the Master changed course, but prior to that time he had taken a number of star shots which indicated that he was perhaps a little north of his track. Two hours later he again changed course in trying to locate the Reef. One hour and 40 minutes later another change; 1 hour and 15 minutes later another change; and then 1 hour and 5 minutes thereafter again changed course, and while on this particular course he noticed the waters of the Reef immediately ahead and ordered a hard right, at which time the vessel swung to the right and at approximately 2:00 a.m., and while the vessel was heading 90° true, the propeller fouled on the submerged portion of the Reef. It would therefore appear that for a period of approximately 4 hours the Master made the following changes in direction, in the dead of night, in an attempt to locate this Reef: from 260° true to 254° true; from 254° true to 359° true; from 359° true to 079° true; and from 079° true to 279° true. This clearly indicates that the direction in which the vessel was sailing was abruptly changed on many occasions during the nighttime in poor visibility, while the Master was attempting to locate this Reef. The sailing directions, with which the Master was familiar, described Tubbataha Reef as consisting of two extensive and dangerous reefs. The official charts, advised him that at high tide these reefs were practically submerged with four or five feet of water. Armed with such knowledge what would a reasonable, prudent Master have done under like circumstances and conditions? Obviously, a prudent Master would have waited a few

hours until daylight and then located the Reef. The few hours wait would be of no significance in the long journey to India. Rather than wait a few hours he adopted the foolhardy and hazardous zig-zag method of attempting to locate the Reef. At that time of night he might as well be attempting to locate the proverbial needle in a haystack. All of this points to exceptionally poor judgment on the part of the Master on this one occasion. This does not mean that respondent knew or by the exercise of reasonable diligence should have known that the Master might "panic" on an occasion such as this. The great weight of the evidence is otherwise. In conclusion, I find, that respondent furnished an adequate and competent crew for the vessel, but that the Master and those under him lost their heads at the time they were making the search for the Tubbataha Reef and that the Master did not act as a reasonable prudent person would act at the time of such search.

The sole proximate cause of the casualty in this case was the act, neglect and default of the Master in the navigation and management of the ship immediately before and at the time of contact with the Reef.

The written record in this cause, consisting of the Pre-Trial Order, the Exhibits, the Depositions, and the Briefs of proctors, is enormous. It has consumed an immense amount of time to martial the facts, analyze the evidence, and study the briefs. The briefs alone approach 250 typewritten pages. I have not read each case cited by proctors. Each case specially emphasized has received my attention, and, I have read selected cases on each of the several legal issues involved. Libelant's objection to each exhibit on which ruling was reserved is sustained.

This Opinion shall stand as my findings and conclusions. Proctors, if they so desire, may propose additional findings. An appropriate Decree of Dismissal shall be prepared, served, and presented.