## GENERAL MOTORS CORP. v. THE OLANCHO et al.

United States District Court, S. D. New York.
March 13, 1953.

108

Hill, Rivkins & Middleton, New York City (Arthur O., Louis and J. Edwin Carey, New York City), for libelant.

Haight, Deming, Gardner, Poor & Havens, New York City (Wharton Poor, Tallman Bissell and Henry J. Formon, Jr., New York City, Advocates), for claimant-respondent.

LEIBELL, District Judge.

### Findings of Fact.

1. At all times hereinafter mentioned and at the time of the trial the libelant, General Motors Corporation, was a Delaware corporation with an office and place of business at No. 1775 Broadway, Borough of Manhattan, City of New York.

2. At all times hereinafter mentioned and at the time of trial, claimant-respondent, Linea Sud Americana, was a Delaware corporation with an office and place of business at No. 82 Beaver Street, Borough of Manhattan, City of New York, and was the owner of the s/s Olancho, a merchant ship engaged in the common carriage of merchandise for hire by sea in foreign trade between,

among others, the port of New York and the port of Buenos Aires.

3. At all material times Garcia & Diaz was the agent at New York and Garcia & Diaz, Ltda, was the agent at Buenos Aires for the vessel and respondent.

4. The s/s Olancho was, during the currency of process herein, within the jurisdiction of this Court.

5. The s/s Olancho was built of steel in 1920, at the Fuller Yard, Wilmington, North Carolina. It was constructed on the Isherwood plan, that is, with the main framing running longitudinally. The vessel is of 6,501 gross tons, 4,016 net register tons, with registered dimensions of 395.3 feet by 55.1 feet by 31.4 feet and is of the 3-island type, with two decks, five hatches and holds. The vessel has a triple expansion engine, with steam supplied by oil-burning boilers, and can do 10 knots.

6. Claimant-respondent purchased the s/s Olancho in the late summer of 1946.

7. The libelant, General Motors Corporation, on or about January 20, 1948, delivered to the respondent and the s/s Olancho in New York the shipments described in the libel, subject to the terms, conditions, exemptions, exceptions and limitations contained in the bills of lading issued therefor, including the United States Carriage of Goods by Sea Act, to be transported to the port of Buenos Aires and there delivered.

8. The shipments described in the libel were received by the claimant-respondent in apparent good order and condition and loaded on board the s/s Olancho in the No. 1 lower hold, afterpart, wing to wing, on or about January 20, 1948. Packages of general cargo were stowed on top of the goods in question, and drums of asphalt forward thereof.

9. The s/s Olancho sailed from New York on January 29, 1948. On January 31, 1948, water was discovered in the No. 1 lower hold. The master thereupon altered course for Bermuda where the vessel arrived on February 2, 1948.

Divers were engaged and they discovered a small hole in a shell plate on the port side of No. 1 lower hold, designated C-3, through which sea water was entering. The sea water ultimately reached a height of 9 feet on the starboard side, 4½ feet on the port side and 6 feet at the cofferdam in No. 1 hold and came in contact with the bundles and cases etc. shipped by libelant. Asphalt from some drums, stowed forward, was deposited on the bundles and cases and automobiles comprising the shipment.

10. The diver engaged by respondent's marine surveyor, J. H. Parker, in Bermuda, made a survey of the underwater portion of the ship on February 3rd and 4th, 1948, directly under No. 1 hold on both sides. He found a hole about 2″ by ¾″ on the port side forward, which he characterized as a "small rust hole".

11. The hole was plugged temporarily by the diver. It was in port plate C-3 from forward in the way of No. 1 Hold. The hole was about 18″ from the second double frame from the forward bulkhead, and about 6″ above the second bilge stringer or longitudinal, which was also wasted for an area of about 10″ by 4″. The surveyor recommended that when the vessel was next drydocked, the defective shell plating and stringer in No. 1 Hold be renewed.

12. The plates of the Olancho are named by letters from the bottom of the ship starting with the keel plate, the next one on each side thereof designated the "A" strake, then the "B" strake, "C" strake, etc., going up the sides of the ship, and the numbers starting from the bow and stern and numbering toward the middle of the ship. The C-3 plate is the third from the bow and the third from the keel.

13. Enough cargo was removed from No. 1 Hold at Bermuda to permit access to the inside of the plate, for temporary repairs by driving a wooden plug into the hole, patching with cement and bolting pieces of steel thereon. The repairs were completed on February 8, 1949. A Lloyd's certificate was issued,

and the vessel sailed from Bermuda on February 10, 1948. There was no further leakage in the No. 1 Hold.

14. Libelant's cargo was discharged at Buenos Aires on or about March 13, 1948. At delivery, the cases and bundles etc. were found to be wet from sea water and stained by asphalt as a result of the leakage on the New York to Bermuda leg of the voyage.

15. When the s/s Olancho returned to New York, claimant-respondent had the C–3 port plate removed in three sections from the vessel's hull, and has stored it in a warehouse on South Street, in New York City.

16. The C–3 plate was located at the turn of the bilge, above the longitudinal of the bilge on the curved side of the ship. Usually there is a ceiling of wood over the bilge itself and a diagonal limber board extending from that longitudinal up somewhat on the side of the ship, covering the part of the plate where the hole developed. The bilge ceiling and the diagonal limber board were removable. The sides of the ship also had wooden battens, a framework to keep packaged cargo from contact with the sides of the ship.

17. A small triangular piece of the plate (Exhibit 9), cut about 6 inches from the hole, shows corrosion and wastage in places on the inner surface to a thinness of about $\frac{3}{16}''$. The corrosion and wastage were not due to the method employed in manufacturing the steel. It was due to accumulation of sweat and debris above the longitudinal and the failure to keep the longitudinal and the plating immediately above it clean and the failure to protect the inner surface of the plate with paint or bitumastic or other protective application.

18. The hole in plate C–3 was a corrosion hole. It and the other corrosion and wastage in the plate in that immediate area had been years in developing on the inner side. It was the result of gradual general deterioration from the use of the plate during the 27 years of the vessel's life and the lack of proper cleaning and painting and other protective coating.

19. The C–3 plate was probably one of the ship's original plates. When new it was .60″ thick. Ordinarily the maximum life of such hull plates is thirty years. Where the corrosion and wastage in a .60″ shell plate reduces its thickness to .43″ (13.76/32″) the plate should ordinarily be renewed.

20. Examination by the Court of a portion of the C–3 plate which had been preserved, showed deep corrosion and pitting on the inner surface approximately 32″ long and 6″ wide in the area where the hole was found. This area is shown on a sketch (Ex. I) and a mold (Ex. J) prepared by respondent's expert, Mr. Wilson, at the Court's request.

21. From December 19th to December 29th, 1947, prior to the voyage in suit, the s/s Olancho was on drydock at the Bethlehem Steel Company's Shipyard at Hoboken, New Jersey, where she underwent a special Lloyd's survey No. 3 and was extensively repaired.

a. Representatives of the owners, representatives of Lloyd's Register of Shipping, and representatives of Bethlehem Shipyard surveyed the vessel. Written specifications were prepared and the Bethlehem Steel Company agreed to do the work.

b. Captain Richard G. Wylie, claimant-respondent's marine superintendent, examined the shell plates and walked around the hull, underneath, accompanied by surveyors of Lloyd's who were appointed to the job and several of the yard men. At this time, plates, which from the outside showed any signs of wear or corrosion were tapped with a testing hammer. The hammer testing was not necessarily limited to those plates.

c. Mr. James A. Moore, surveyor for Lloyd's Register of Shipping, conducted what is known as a "special survey", a drydocking survey, which a vessel must pass every four years in order to comply with the Lloyd's classification society rules. This survey includes an ex-

amination of the hull, the shell plating, the deck, the holds, the rudder and the double-bottom tanks, among other things. He made a general examination of the holds and a visual examination of the shell plating. The thickness of the plates was determined by drilling. Mr. Moore was present daily, on and off; saw that the work was done; and inspected the vessel to insure that the repairs required by the survey were completed. He went inside the vessel and examined the plates for leakage, during a hose test of the plates where rivets were renewed or a drilled hole plugged and welded. Thereafter he issued a Report of Survey for Repairs, etc., No. 48262 (Exs. C–1, C–2), wherein the ship is described as then being in a safe condition and eligible to continue as classed. A Classification Certificate (Ex. D) was made, certifying that he surveyed the s/s Olancho while afloat and in drydock, and that he had transmitted a report to the Committee of Lloyd's Register of Shipping, London, stating that all repairs recommended by him were completed to his satisfaction.

d. Mr. Richard D. Warren, hull foreman at Bethlehem Shipyard, was in charge of the hull work performed on the s/s Olancho. He had 15 to 25 men working under him. He would visit the job several times a day. Mr. Warren made some examination of the shell plating, both inside and outside, and except for one plate which he picked up on his reading and which was replaced, he did not see any defects, wastage, or corrosion on the s/s Olancho's shell plating.

e. Mr. Ronald Jones, the "Snapper" in Bethlehem Shipyard's hull department, worked under Mr. Warren and was in charge of the men who did the hull work on the Olancho. He worked solely on the Olancho for about eight days, eight hours a day. He first went around with Mr. Moore, Lloyd's surveyor, and with the usual testing hammer sounded for weak spots in the s/s Olancho's plates. Jones observed quite a few of the water hose tests after the holes were tapped and welded. Mr. Jones was inside the No. 1 Hold and examined the shell plating and did not notice any corrosion or wastage.

f. Capt. Rementeria, then Master of the vessel, who had then been a Master for about 16 years and had been going to sea for 25 years, was present during the survey, was down in the No. 1 Hold, and was present when the examination of the plates in that hold took place. He looked in the bilges himself and saw that they were clean and in good order. He looked at the plates. He did not use a hammer. He and the Chief Engineer and the inspector for the company went around outside the vessel and he saw the inspector hit the rivets and plates.

g. Captain Toledo was then the Chief Mate of the s/s Olancho. He had been going to sea for 13 years. It was his duty to see that everything was properly done. He went down into the No. 1 Hold three, four, or more times daily, inspected the bilges in that hold, ordered the "longshoremen" to clean them up, saw that everything was clean and ordered it to be covered. The shell plating in the No. 1 Hold looked all right to him; they all looked well. He did not see any plates in any of the bilges that were wasted or corroded. He saw the foreman or longshoremen inspector use a hammer testing the plates, going all over in every corner, trying the plates with the hammer. He was inside the s/s Olancho when they were hose testing the plates from the outside.

h. The plates of the s/s Olancho were hammer tested with the usual testing hammer in efforts to locate weaknesses or defects, if any, in her plates. A plate the size of the port C–3 would be tapped with a hammer about 12 or 15 times. Some of these soundings were taken, among other places, within a few inches of the internal stringer members.

i. The Olancho's shell plating between light load line and 27 foot mark, port and starboard from stem to stern, was scaled on the outside. The C–3 port plate was between the light load line and the 27 foot mark.

j.   About 3,300 rivets were replaced in the plating of the Nos. 1 and 2 Holds below the water line and approximately 1,600 rivets replaced in No. 2 Hold, port side, above the water line.   The condition of the rivets and the number of rivets to be replaced would not necessarily indicate that the plating itself was defective.

k.   The vessel's plates were tested by drilling series of holes in the various plates in accordance with the written specifications and orders.   Six belts of holes were first drilled, one belt completely around the ship in the forepeak, one belt completely around the ship aft of the forepeak bulkhead, one belt completely around the ship at the aft end of No. 3 Hold, one belt completely around the ship in the forward end of No. 4 Hold, one belt completely around the ship forward of the after peak, and one belt completely around the ship in the after peak.   In addition, several strakes were picked out where holes were drilled at each end and in the center of the plates therein.   Three calibration holes were drilled in plate C-3, port side.   About 450 test holes were drilled in the s/s Olancho's plates and calibrations taken to measure their thickness.   Some of these holes were drilled in places where visual examination of the outside of the hull and hammer testing revealed a hollow spot.   After a test hole was drilled, the plate was scaled both inside and outside for 3 or 4 inches in the way of hole and the thickness of the steel measured with a gauge.   The readings of the holes were marked on the plate on the outside.   Each hole was then tapped, plugged, and welded both inside and outside.

l.   After the survey and repairs were completed, the plates of the s/s Olancho were subjected to a water test in which water under 40 to 50 pounds pressure was forced through a hose and directed at her plates, in the areas where rivets had been replaced and calibration holes drilled.   At times Capt. Toledo and Mr. Moore, Lloyd's surveyor, were inside the vessel with a repair yard man to see if there was any leakage and saw none.

m.   The vessel's limber boards and bilge boards were removed in the course of the work.   Sweat battens were removed from the interior of the vessel by the Bethlehem Shipyard workers where they were drilling holes in the way of the rivets, as in No. 1 Hold.

22.   In the late summer of 1946, when claimant-respondent purchased the vessel, she was drydocked in the Todd Shipyard at New Orleans where she was examined and inspected under the supervision of two surveyors from the American Bureau of Shipping, two surveyors from Lloyd's Register, and two representatives of claimant-respondent, one of whom was Captain Richard G. Wylie, then Marine Superintendent for Garcia & Diaz, claimant-respondent's agent.   At this time the hull was examined visually and by tapping it with a hammer in certain places.

23.   During an Atlantic voyage in March, 1947, the vessel encountered heavy weather of hurricane force, as a result of which two sister plates (one of the port side and one on the starboard side) were loosened up in Hold No. 5.   A hole developed in one of them, plate B-3 from aft on the port side.   The vessel returned to New York where she was drydocked at the Erie Basin Yard of the Todd Shipyards on March 15th.   The cargo in the No. 5 Hold was removed and a survey of the plates in that hold carried out.   The following persons were present at the survey:   Mr. Garcia of Garcia & Diaz; Capt. Richard G. Wylie of Garcia & Diaz; Mr. Francis A. Martin of Martin & Boyt, surveyors for Garcia & Diaz; Mr. Keller of Lloyd's Register of Shipping; Mr. Ganly of the United States Salvage Association; a Mr. W. E. Keller of the Todd Shipyard Corporation; Mr. W. R. Bagger, and the master and officers of the vessel.   Tests showed that the corresponding plate, B-4, on the vessel's starboard side was thin in the same place.   Both plates were removed.   As a result of the survey, four

other plates, C–4 and D–5 from aft on both port and starboard sides in No. 5 Hold were found to be thin due to corrosion, and were replaced.

24. The C–3 port plate, in Hold No. 1, was about 24 feet long and 3½ feet wide. It contains an area of heavy corrosion (deep pock marks) which extends for about 3 feet in length and about 6 inches in width. The hole which developed in the C–3 port plate on January 31, 1948, is about 2 inches long and averages about ¾ inch in width and is about centrally located in that area. The pock marks are about 1½ inches in diameter. There is a belt of these pock marks extending fore and aft of the hole for a distance of about 1½ feet each way. The corrosion belt was in an area above a longitudinal frame.

25. There are three calibration-hole plugs in the entire C–3 port plate (sketch of shell plate C–3 port side, by Mr. J. Lyell Wilson, 12/11/52). One, which appears to be the most recent, is about 36 inches from the edge of the hole in the plate. Another is about 40 inches from that hole. The third is many feet away. The C–3 port plate was drilled in three places at the drydocking immediately prior to the voyage in suit.

26. On May 20, 1937, the Chief Surveyor of the American Bureau of Shipping issued a warning concerning corrosion and deterioration of plates internally in longitudinally framed ships. His circular (Exhibit 11) reads as follows:—

"May 20th, 1937.
"From: Mr. D. Arnott
"To: All Surveyors
"Subject: Circular Letter No. 5–37 Fractured Shell Plates on Longitudinally Framed Ships.
"Gentlemen:

"We have had one or two cases recently of shell plating in way of the forward hold fracturing at sea, causing flooding and serious damage to cargo. Upon examination it was found that these fractures were due to corrosion and grooving along the line of the top of the longitudinals, these grooves extending in some cases through half the depth of the shell plate (see sketch attached). The wastage at the frames was apparently caused by an accumulation of moisture or sweat, intensified in some cases by cargo deposits, such as, sulphur, and as the grooves are to some extent filled with rust the condition is not always easy to find unless specially looked for.

"You might be good enough to give this matter your attention on every available occasion when surveying the holds, especially the forward hold, of longitudinally framed ships in order that such corroded and defective plating can be renewed in time to prevent such fractures.

"Yours very truly,
"American Bureau of Shipping
"D. Arnott-Chief Surveyor."

27. The warning by the American Bureau of Shipping was reissued after the experience in January 1940, in the case of The Zarembo, D.C., 44 F.Supp. 915.

28. The respondent had been warned that the ship's shell plating was deteriorating with heavy corrosion and wastage by reason of its experience with this ship in March 1947 when six plates and some bilge angles in the way of No. 5 Hold and bilges were found to be badly deteriorated, after one plate had holed through and seawater damaged cargo.

29. Lloyd's surveyor who attended the vessel in December 1947 had knowledge of the conditions referred to in the American Bureau of Shipping circular dated May 20, 1937 (Exhibit 11) and so did Mr. Wylie, the marine superintendent of respondent's agent.

30. In the exercise of due diligence it was necessary to give special attention to the inside of the hull, to inspect carefully the shell plating from the inside, and to inspect and scrape the plates for corrosion on the inside in the way of the

bilges and in the vicinity of the longitudinals.

31. During all the examinations, inspections, tests and repairs in December 1947, no one reported any corrosion, wastage, thinness or weakness in the C–3 port plate. They did report that the F–2 port plate was weakened and that plate was replaced.

32. If those who inspected the vessel in December 1947 had looked carefully and scraped the plate in the vicinity of the longitudinal, where the pock marked errosion was located, they would have found the pitting, corrosion and wastage on the inner surface of plate C–3, where the hole later developed.

33. The failure of plate C–3 was the result of the gradual deterioration of its inner surface in progress for years, accelerated by failure to apply a protective coating, and was not due to any latent defect in the steel of the plate.

34. Respondent did not exercise the diligence required to make the s/s Olancho seaworthy in December 1947, considering all the circumstances: that the Olancho was a longitudinally framed ship; that the American Bureau of Shipping had warned all surveyors to look especially for corrosion and grooving along the line of the longitudinals in the forward hold when surveying ships of this type, in order to discover and renew corroded and defective plating; that this ship had developed a leak in March 1947 which resulted in the removal of six corroded and defective plates from No. 5 Hold at that time.

### Conclusions of Law.

I. The libelant, General Motors Corporation, as the shipper and owner of the cargo described in the libel, is entitled to maintain this action. The respondent, Linea Sud-Americana, Inc., the carrier, is the proper party respondent.

II. This Court has jurisdiction of the parties, of the ship, the s/s Olancho, and of the subject matter of this action.

III. The bill of lading constituted the contract of carriage between the libelant and the claimant-respondent.

IV. The bill of lading was issued subject to and was governed by the United States Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq.

V. Under the Carriage of Goods by Sea Act, the carrier was bound before and at the beginning of the voyage to exercise due diligence to make the ship seaworthy.

VI. To receive exemption from liability as to the cargo in No. 1 Hold damaged by salt water under said Carriage of Goods by Sea Act, the carrier has the burden of proving the exercise of due diligence to make the ship seaworthy.

VII. The s/s Olancho prior to and at the beginning of the voyage from New York on January 29, 1947, was unseaworthy with respect to the port plate C–3 from forward in Hold No. 1.

VIII. Respondent did not exercise due diligence to make the s/s Olancho seaworthy in respect to said plate.

IX. Respondent did not meet its burden of proof to establish its defenses of "due diligence" and "latent defect" under the Carriage of Goods by Sea Act, T. 46 U.S.C.A. § 1304(1) and § 1304(2) (p).

X. Libelant is entitled to an interlocutory decree holding the respondent liable for the damage to the cargo it shipped at New York on the s/s Olancho in January 1948 for carriage to Buenos Aires. A Commissioner will be named to ascertain and report the amount of the damage.

The libel in this action is for the damage to a shipment of automobile parts, automobiles, etc., delivered by libelant to the s/s Olancho at the port of New York for carriage to Buenos Aires, in January 1948. It is alleged that the shipment was in good order and condition when delivered to the vessel in New York but on arrival at Buenos Aires was turned out rusted, broken and damaged from contact with water, pitch blend and foreign substances.

The damage to the cargo resulted from a leak which developed in plate C–3, port side, in Hold No. 1, when the vessel was

two days out of New York. Shortly prior to sailing and in late December 1947 the vessel had been drydocked at the Bethlehem Steel Shipyards, surveyed by Lloyd's, repaired and certified as seaworthy.

The answer of the claimant-respondent pleads the provisions of the Bill of Lading and the Carriage of Goods by Sea Act as a defense.

My findings of fact are set forth hereinabove in some detail. This memorandum will discuss the two issues presented by respondent's special defenses.

The Bill of Lading, in paragraph 1 thereof, specifically provides that it "shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States of America, approved April 16, 1936, which shall be deemed to be incorporated herein". The Act itself, T. 46 U.S.C.A. § 1300, provides that every bill of lading for the carriage of goods by sea to or from ports of the United States in foreign trade shall be subject to the provisions of the Act. Under Section 1303 the carrier is bound "before and at the beginning of the voyage, to exercise due diligence to * * * make the ship seaworthy". Section 1304 provides that "Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy" and that "Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under the section." Section 1304 also contains a provision that neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from "latent defects not discoverable by due diligence".

The duty imposed on a ship owner to exercise due diligence to make his vessel seaworthy before the vessel breaks ground is non-delegable. If the surveyors or the employees in the shipyard failed to exercise due diligence the shipowner is chargeable therewith. Navigazione Libera Triestina v. Garcia & Maggini Co., 9 Cir., 30 F.2d 62 at page 64. The shipowner has the burden of proving under the Carriage of Goods by Sea Act, that he has performed that duty. T. 46 U.S.C.A. § 1304(1). What constitutes due diligence depends upon the facts and circumstances of the particular case. The Bill, D.C., 47 F.Supp. 969, at page 976. Although in its special defense of "due diligence" the respondent pleads that the Olancho was in fact seaworthy for the voyage, there is really no issue in this case as to the unseaworthiness of the s/s Olancho when she sailed from New York January 29, 1948. The nature of the leak, through a hole in a plate, developing in mild weather two days after leaving port, and the pitted, corroded condition of that section of the C–3 plate, clearly show that the vessel was unseaworthy in respect to that plate when she broke ground in New York. The liability of the shipowner follows, unless, under the provisions of the Carriage of Goods by Sea Act, he can establish the defense pleaded that he exercised due diligence in attempting to make the ship seaworthy before she broke ground. Artemis Maritime Co. v. Southwestern Sugar & M. Co., 4 Cir., 189 F.2d 488, at page 491.

The failure to locate the defective area of plate C–3 was due to the fact that some persons who were supposed to test the plates and look for defects did not do their job as it should have been done. The defective area in plate C–3 was quite extensive. It was not just one small deeply corroded spot that might have been difficult to locate. For about a foot, both fore and aft of the hole, there were deeply pitted areas.

Exhibit 9, a small right-angle triangular section of the steel plate, shows deep pock marks. The hypotenuse of that triangular section was only about six inches from the deep pock that holed through in mild weather, about two days after the vessel left New York. The area shown on the plastic mold (Ex. J) adjacent to the triangular section is about four feet long and a foot wide. It con-

tains a strip about two and a half feet long where the pitting was almost as deep as that shown on Exhibit 9. The width of the pitted area varied from about six inches to two inches. If any careful inspection had been made of that part of plate C–3, the deep pitting should have been discovered. If the hammer test had been properly made over this pitted area of plate C–3, its true condition would have been noted. From the description of the method of hammer testing of the plates, as testified to by the hull foreman and the snapper of the Bethlehem Steel repair crew, it is hard to understand how they could have missed this area, if they actually hammer-tested as they said.

The workmen who calibrated a test hole, at a distance of two to three feet from this pitted strip, should have seen it, because they had to work on the inside of the plate as well as outside in calibrating the test hole. After the test hole near this pitted area was plugged and welded, it was hose tested. During that operation a person is stationed inside the hull to watch for any water leaks, when the hose is played on the tapped test hole from the outside. If the person inside the hull had been looking at the tapped test hole he should have been able to see the deeply pitted area of that plate only two or three feet from the test hole.

About 3,300 defective rivets were removed from the plating in Nos. 1 and 2 Holds while the s/s Olancho was in drydock in the latter part of December 1947. In doing this work it was necessary to remove all wood coverings (the ceilings) of the bilges and the wooden cargo battens along the sides of the ship. Item 45 of the Bethlehem Steel Company

bill describes this repair work.[1] The plating and longitudinals and bilges in No. 1 Hold were visible when the bilge coverings and the cargo battens were removed.

The s/s Olancho was constructed at Wilmington, North Carolina, in 1920, with longitudinal framing, I (eye) beams or stringers, running fore and aft. This was known as the Isherwood type of construction. Ships having this type of construction began to give trouble in 1937. Shell plating in way of the forward hold would fracture at sea. These fractures were due to corrosion and grooving along the line of the top of the longitudinals, the grooves extending in some cases through half the depth of the steel plate. "The wastage at the frames was apparently caused by an accumulation of moisture or sweat, intensified in some cases by cargo deposits, such as, sulphur, and as the grooves are to some extent filled with rust the condition is not always easy to find unless specially looked for". The above is quoted from a notice, dated May 20, 1937, from the Chief Surveyor of the American Bureau of Shipping, addressed to "All Surveyors". It was entitled "Fractured Shell Plates on Longitudinally Framed Ships". The notice concluded with an admonition that this matter should have the attention of the surveyors "on every available occasion when surveying the holds, especially the forward hold, of longitudinally framed ships in order that such corroded and defective plating can be renewed in time to prevent such fractures". This May 20th, 1937 warning was reissued in 1941 after the January 1940 experience of The Zarembo, D.C., 44 F.Supp. 915, 950, which suffered a fractured plate as the

---

1. "45. *Rivets:*
    Furnished labor and material, removed bilge ceiling and cargo battens, port and starboard sides in #1 and "2 holds, erected necessary staging on drydock and in hold and burned out approximately 3,300 scattered wasted shell rivets below water line and approx. 1,600 rivets in #2 hold port side above water line. Upon completion tested shell by hose

    spraying same and proved all right to the satisfaction of Lloyd's Surveyor and Chief Engineer. Replaced all bilge ceiling and cargo battens, removed stagings and supports and left all in good order. Worked necessary overtime as directed. Removed 320' of defective bilge board and 320' of defective cargo battens. (51–60) ................. 10,747.00"

result of corrosion. "The Zarembo" was a ship of the Isherwood type, with longitudinal framing. So was The Otho, D. C., 49 F.Supp. 945, which also suffered a fractured plate in January 1941, due to corrosion.

The surveyor for Lloyd's (Mr. Moore) and the Garcia-Diaz's representative (Mr. Wylie) knew of this warning notice. They had an "available occasion" presented to make a very careful examination of the plating "along the line of the top of the longitudinal" when the wasted rivets and a plate (F-2 port) were renewed in the No. 1 Hold of the Olancho in late December 1947. The May 1937 notice of the American Shipping Bureau warned them that the rusted grooves might be "to some extent filled with rust" and that they were "not always easy to find unless specially looked for". That warning called for an extraordinary effort to locate the rusty grooves, through the use of a wire brush and 'digging around along the heels of the longitudinal frames' and scraping in that area. Huilever, S. A. Division Huileries Du Congo Belge v. The Otho, 2 Cir., 139 F.2d 748, at page 750. "Due diligence" in examining plating in a longitudinally framed ship, especially in the forward hold, called for the exercise of greater care than that usually required in making a transversely framed ship seaworthy. That greater degree of care the respondents and its agents and representatives failed to exercise in this case.

The recent history of the s/s Olancho should also have put the surveyors and the agent's representative on notice to exercise great care in examining the plating of this ship in December 1947. In March of 1947 the ship met with very heavy weather and sprang a leak in the No. 5 Hold. The ship had to be drydocked and two plates in Hold No. 5 were renewed. Four other defective plates were also renewed at that time and some bilge angles.

In late December 1947 the Olancho was drydocked for her regular four year Lloyd's examination for further classification. During that examination plate F-2 port side in No. 1 Hold was found to be defective and was renewed. In addition, about 3,300 wasted rivets, below the water line were renewed in Holds No. 1 and No. 2 and about 1,600 in No. 2 Hold, port side, above the water line. The ship was removed for loading before other rivets, above water line, could be renewed.

After the Olancho had sprung a leak in plate C-3 port side on January 31, 1948, when two days out of New York, she changed her course and put into Bermuda on February 2nd, where temporary repairs were made on the 3rd and 4th. She received a certificate of seaworthiness, as fit to continue on her voyage, but J. H. Parker, the Marine Surveyor who issued the certificate, expressed the opinion that "when vessel is next drydocked that defective shell plating and stringer in No. 1 Hold be renewed". After she returned to New York the C-3 plate was removed.

The corrosion, the deep pitted corrosion on plate C-3, in the area where the plate holed through in mild weather on January 31, 1948, was just above the location of a longitudinal frame, as shown by the rivet holes on photographs of the plate (Exs. F-a and F-b) and as shown on Mr. Wilson's sketch of the corroded section (Ex. I). This deep pitted corroded section in the forward hold (No. 1) above a longitudinal, is the kind of a location where the 1937 notice of the American Shipping Bureau warned surveyors to look for corrosion and grooving. The surveyors who examined the Olancho in late December 1947 knew of this warning. If they had heeded it, the deep pitted corrosion in which the hole developed two days after the vessel put to sea, would have been discovered and the defective plate removed.

As Judge Bryan stated in Southwestern Sugar & M. Co. v. Artemis M. Co., D.C., 92 F.Supp. 631, 632; "Thus her own (The Demosthenes) revelation at sea of her actual unsoundness refutes the surveys and inspections, and the

vigilance of these is denied by the foreseeable, protracted and progressive nature of her debility."

In the case at bar the defense of "latent defect" is also urged in respondent's brief, and the deep pitted corrosion is alleged to have been due to a defective method of manufacturing the steel plate, in that it is claimed that a chemical analysis of the steel shows that it had certain properties which allegedly resulted from rolling the plate when the steel was too hot.

The last contention was the subject of expert testimony offered by respondent through the witness, Wilson. Assuming the correctness of the expert's testimony (although I think it was highly speculative) that the corrosion was the result of a defective manufacturing process, the defective process may not have been known to be the cause of the corrosion, but the corrosion itself was not latent. It had been developing over a period of years. It could have been discovered, if the inspection of the inside of the plates in the forward hold in the immediate vicinity of the longitudinal frames had been made with the degree of care required in a vessel of this type of construction.

 "A true latent defect is a flaw in the metal and is not caused by the use of the metallic object. 'A latent defect is one that could not be discovered by any known and customary test.' [The Bill, D.C., 47 F.Supp. 969, 978] * * * A true latent defect is not a gradual deterioration but is a defect in the metal. The ship owner has the burden of showing that the latent defect was not discoverable." Waterman S. S. Corp. v. United States S. R. & M. Co., 5 Cir., 155 F.2d 687, 691.

I have concluded that the s/s Olancho was unseaworthy when she set sail on the voyage from New York to Buenos Aires; that the respondent did not exercise the due diligence which the special facts in this case required to make the vessel seaworthy; that the leak in plate C-3, port side, was due to corrosion which could have been dis-

covered by the exercise of greater care, and that it was not due to any latent defect in the plate. As stated in my Conclusion of Law X—

"X. Libelant is entitled to an interlocutory decree holding the respondent liable for the damage to the cargo it shipped at New York on the s/s Olancho in January 1948 for carriage to Buenos Aires. A Commissioner will be named to ascertain and report the amount of the damage."

Settle an interlocutory decree accordingly.