**JOHN PENNY & SONS, LIMITED**
and
**Caribou Fisheries, Ltd., Libellants,**
v.
**M/V SWIVEL, her engines, boilers, etc.,**
and
**Lake Shipping Company, Ltd., Libellees.**

No. 63–61.

United States District Court
D. Massachusetts.
April 4, 1967.

William T. Conlan, Andrew F. Lane, Ely, Bartlett, Brown & Proctor, Boston, Mass., for libellants.

James A. Whipple, Richard B. Kydd, Kneeland & Splane, Boston, Mass., for respondents.

## OPINION

JULIAN, District Judge.

The plaintiffs, John Penny & Sons, Limited, and Caribou Fisheries, Ltd. (hereinafter referred to respectively as "Penny" and "Caribou"), brought this action in admiralty to recover damages from the defendants, M/V SWIVEL and Lake Shipping Company, Ltd. (hereinafter referred to as "Lake"), resulting from the contamination of a cargo of frozen fish by ammonia fumes which escaped from a fractured ammonia pipe forming part of the refrigeration system in the hold of the SWIVEL in which the cargo was stowed.

On motion of the plaintiffs, assented to by the defendants, and allowed by the Court, the Insurance Company of North America was admitted as a party plaintiff, because as an insurer of Penny it has paid the amount of the loss to Penny, and if the defendants are found liable it is entitled to the proceeds of the judgment.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On March 23, 1963, Penny, a Canadian corporation, delivered to the SWIVEL, a vessel owned by Lake, also a Canadian corporation, a cargo of frozen fish contained in 5,522 cartons of various weights ranging from 12 to 67½ pounds. Lake, in its capacity as a common carrier, received the cargo in good order and condition at the port of Ramea, Newfoundland, for delivery to the plaintiff Caribou, a Canadian corporation, at the port of Gloucester, Massachusetts, and issued a bill of lading.

The SWIVEL departed from Ramea on March 23, 1963. On Wednesday, March 27, beginning at approximately 4:00 A. M., the ship encountered rough seas with heavy swells almost abeam and winds of force 5 on the Beaufort scale. By 8:00 A.M. the wind had attained a force of 6 and the ship was rolling approximately 30–35 degrees. The captain of the vessel testified that the alternative to the course which he followed in taking the waves abeam would have been to head into the wind and change the roll into a pitch.

At approximately 10:15 A.M., when the ship was about 80 miles from Cape Ann in the shoal waters of Cashes Ledge, the chief engineer reported to the captain that the smell of ammonia was coming from the number 3 hold and that he suspected a leak in the ammonia piping which made up the refrigeration system in that hold. The flow of ammonia to the hold was shut off five or ten minutes after the smell of ammonia was detected. By 4:00 P.M. the wind had subsided to force 4. The ship arrived at Gloucester at about 7:30 P.M.

On Wednesday evening, after the docking, the hatch of hold number 3 was opened and partially covered with canvas, leaving an opening of about 10 square feet for the escape of ammonia fumes. Dry ice was placed in the hold to prevent the cargo from spoiling. On Thursday, March 28, in the course of the normal discharge of cargo, six pallets of the cartons in hold number 3 were unloaded dockside. It was then noticed that the containers of this cargo were contaminated by ammonia fumes and could not be sent to a public warehouse. These six pallets of goods were therefore reloaded into hold number 3 while the receiver, Caribou, made arrangements with Lake to ship these goods back to Penny in Ramea for testing and repackaging.

On Friday morning, March 29, the cargo from hold number 3 was loaded into hold number 2 and reshipped to Ramea for this purpose. This course of action minimized the financial loss due to the contamination of the cartons.

Upon inspection of hold number 3 it was discovered that there was a fracture in the expansion line, a steel pipe running parallel to the ceiling and to the forward bulkhead, twelve inches below the ceiling, two inches out from the forward bulkhead, and about two and one-half feet above the top of the cargo. The expansion line had an inner diameter of one-half inch, a thickness of $3/8$ or $1/4$ of an inch, and a length of approximately two feet. It carried ammonia as a part of the refrigeration system. The pipe was joined in the center by a union and connected to an elbow at each end. Although the pipe was of relatively small diameter and lay exposed to contact with the cargo, it was not encased or protected in any way.

The pipe was found bent upward at the union and fractured at the thread where it was joined to the union. The crack extended halfway round the pipe. It was through this opening that the ammonia fumes had escaped into the hold.

The cargo of heavy rectangular cartons had been stowed tightly when loaded in hold number 3 and was still tightly stowed in the same position at the time of unloading on March 28. Considering the shape, weight and stowage of the cargo as well as the secure position of the cartons before and after the voyage to Gloucester, I find that the cargo did not shift its position during the voyage.

The SWIVEL was built in 1943 with a wooden hull and a steel frame and bulkhead. The refrigeration system was installed in 1948. There was no evidence of any overhaul or replacement of parts in the refrigeration system since the installation. Although the SWIVEL had undergone its last annual overhaul in June, 1962, the only work done in hold number 3 was to wire-brush and paint the pipes. There was no evidence that since their installation in 1948 the pipe in question or any other part of the refrigeration system was ever inspected, or disassembled, or in any way tested for wear, tear, corrosion, or lack of suitability for the purposes for which the ship was to be used. Before loading the cargo for this voyage the captain inspected hold number 3 for cleanliness and temperature only. He perceived no smell of ammonia in the hold at that time.[1]

The captain testified that the weather encountered on this voyage was not unusual for that area of the Atlantic in March. He had, in fact, experienced the same weather on that course with the same type of cargo in March of 1961, 1962, and 1963, but had never before experienced a break of an ammonia pipe.

Counsel for the plaintiffs put Lake on notice to produce the fractured pipe at the trial of this case. The pipe was not produced and no satisfactory explanation was given for the defendants' failure to produce it.

---

1. "A mere superficial inspection of a ship is insufficient to establish an exercise of due diligence on the part of the owner to make her seaworthy." Ore Steamship Corp. v. D/S A/S HASSEL, 1943, 2 Cir., 137 F.2d 326, 329.

It was agreed by the parties that the damage to the cargo was caused by the ammonia that escaped at the break in the expansion line. It was further agreed that the damages arising from the loss are $7,125.82 and this amount plus costs and interest shall be awarded if the Court finds the defendants liable.

The parties have also stipulated that the law to be applied to the decision of this case is the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. §§ 1300–1315. The pertinent sections of that Act are as follows:

"§ 1300. *Bills of lading subject to chapter.*

Every bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea to or from ports of the United States, in foreign trade, shall have effect subject to the provisions of this chapter.

\* \* \* \* \* \*

"§ 1303. *Responsibilities and liabilities of carrier and ship— Seaworthiness.*

(1) The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to—

(a) Make the ship seaworthy;

(b) Properly man, equip, and supply the ship;

(c) Make the holds, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage, and preservation.

(2) The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried.

"§ 1304. *Rights and immunities of carrier and ship—Unseaworthiness.*

(1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied, and to make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried fit and safe for their reception, carriage, and preservation in accordance with the provisions of paragraph (1) of section 1303 of this title. Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.

(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship;

\* \* \* \* \* \*

(c) Perils, dangers, and accidents of the sea or other navigable waters;

(d) Act of God;

\* \* \* \* \* \*

(p) Latent defects not discoverable by due diligence; and

(q) Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage."

■■ The plaintiffs have established 1) that the cargo of fish was delivered to the shipper, Lake, in good order and condition, 2) that the goods arrived at the port of destination in damaged condition, and 3) that the damage was caused by a break in the ammonia expansion pipe in hold number 3. At this point the plaintiff has established a prima facie case under COGSA, and the burden of proof is on the defendants to show that the loss was due to one of the excepted causes listed in COGSA. Schnell

v. The Vallescura, 1934, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373;[2] President of India etc. v. West Coast Steamship Co., 1962, D.Or., 213 F.Supp. 352, affirmed, 327 F.2d 638 (9 Cir., 1964),[3] cert. denied, 377 U.S. 924, 84 S.Ct. 1222, 12 L.Ed.2d 216; General Motors Corp. v. The Olancho, 1953, S.D.N.Y., 115 F.Supp. 107, affirmed, 1955, 2 Cir., 220 F.2d 278. The burden rests upon the carrier to show that the loss was due to an excepted cause and that he has exercised due care to avoid it, "not in consequence of his being an ordinary 'bailee' but because he is a special type of bailee who has assumed the obligation of an insurer." Commercial Molasses Corp. v. New York Tank Barge Corp., 1941, 314 U.S. 104, 109, 62 S.Ct. 156, 160, 86 L.Ed. 89. The rationale underlying this doctrine was stated as follows in the case of Schnell v. The Vallescura, supra, at page 304, 55 S.Ct. at page 196:

> "[The carrier] is a bailee intrusted with the shipper's goods with respect to the care and safe delivery of which the law imposes upon him an extraordinary duty. Discharge of the duty is peculiarly within his control. All the facts and circumstances upon which he may rely to relieve him of that duty are peculiarly within his knowledge and usually unknown to the shipper. In consequence, the law casts upon him the burden of the loss which he cannot explain or, explaining, bring within the exceptional case in which he is relieved from liability."[4]

█ The defendants have raised the affirmative defenses of 1) fault or error in navigation, or in the management of the vessel, and 2) due diligence to make the ship seaworthy. If either of these defenses is established the defendants are excepted from liability. 46 U.S.C. § 1304(1) and (2) (a) (quoted supra). As stated above, however, the burden of proof in each instance is on the defendants.

█ Considering first the defense of fault or error in navigation or in the management of the vessel, the captain of the SWIVEL described the sea and weather conditions on the morning of March 27 as follows: wind velocity 35 m. p. h. with gusting up to 50 or 60 m. p. h.,[5] beam seas with a roll of 30 to 35 degrees. The captain testified that the rolling could have been reduced by heading the ship into the wind. This, however, would have produced a pitching motion in place of the roll. There was no testimony, expert or otherwise, as to the relative merits or disadvantages of a rolling or pitching motion under these circumstances. It is therefore impossible to find, on the basis of the evidence, that the captain or any member of the crew committed any error of navigation or management of the ship through any act, neglect or default. In addition, the defendant has failed to establish that the rolling motion of the ship caused the break in the ammonia pipe. Further, there was no indication that any other course of action under the conditions present would be less likely to produce a broken pipe.

I find that the defendants have not proved that the damage to the cargo resulted from any act, neglect or default in the navigation or in the management of the ship or from any peril, danger, or accident of the sea.

█ I consider now the respondent's defense that it used due diligence in making the vessel seaworthy. "The obligation [on the shipper], although ab-

---

2. This case was cited as authority by the Supreme Court in Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 109, 62 S.Ct. 156, after COGSA which became effective in 1936.

3. In affirming, the Circuit Court expressly adopted the opinion of the District Court as its own.

4. This language is quoted and the reasoning adopted in Waterman S.S. Corp. v. United States S. R. & M. Co., 1946, 5 Cir., 155 F.2d 687, 691.

5. The captain's testimony on the velocity of the wind is not corroborated by the entries in the ship's log. The strongest wind noted in the log is wind force 6 on the Beaufort scale.

solute, means nothing more or less than the duty to furnish a ship and equipment reasonably suitable for the intended use or service." President of India, etc. v. West Coast Steamship Co., supra 213 F.Supp. at 356. As was further stated in the President of India, etc., case, supra at 359, "Under COGSA * * * the burden of proof to establish seaworthiness or the exercise of due diligence is on the respondent," and "doubtful issues must be resolved in favor of cargo."

■ On the basis of the testimony of the captain of the vessel the weather and sea conditions encountered on this voyage were no more severe than he had encountered in the same area aboard the SWIVEL with the same cargo in March of the preceding two years. The most severe weather conditions logged during the voyage reached force 6 on the Beaufort scale. In the case of Middle East Agency v. The John B. Waterman, 1949, S.D.N.Y., 86 F.Supp. 487, 489, the court stated that a wind force of 9 and 10 on the Beaufort scale with very heavy seas should have been anticipated during March in the North Atlantic. There is therefore no indication that the vessel was subjected to conditions that should not have been anticipated. See also Ore Steamship Corp. v. D/S A/S HASSEL, 1943, 2 Cir., 137 F.2d 326, 328; and Edmond Weil, Inc. v. American African Line, Inc., 1945, 2 Cir., 147 F.2d 363, 366.

■ The vessel itself was built in 1943 with a wooden hull and steel frame and bulkhead. The refrigeration system was installed in 1948. There was evidence that the ship was overhauled annually, and that the last overhaul prior to this incident took place in June, 1962.

At that time the only work done on the refrigeration system was a wire-brushing and painting of the pipes. Just before loading the cargo at Ramea the captain inspected hold number 3, but only to check on its cleanliness and temperature. There was no evidence as to what, if any, regular maintenance had been exercised on this equipment since its installation fifteen years prior to this occurrence. There was no evidence that the pipe had ever been inspected or tested for wear, corrosion or weakening due to the stresses and strains over a period of fifteen years. The duty of exercising due diligence to make the vessel seaworthy is on the owner, Lake, and is nondelegable. General Motors Corp. v. The Olancho, supra 115 F.Supp. at 115. I find that the defendants have not sustained their burden of proving that before and at the beginning of the voyage the carrier exercised due diligence to make the SWIVEL seaworthy, to secure that the ship was properly equipped, and to make number 3 hold and the refrigerating equipment in it fit and safe for the reception, carriage, and preservation of the cargo of frozen fish.

■ Since the plaintiffs have established a prima facie case, and the defendants have failed to show that "the cause of the loss was within one of the narrowly restricted exceptions which the law itself annexes to his undertaking"[6] which would relieve him from liability for the loss, I find for the plaintiffs in the amount of $7,125.82 plus interest and costs. It is ordered that judgment for $7,125.82 plus interest and costs be entered for the plaintiff Insurance Company of North America, the real party in interest.

6. Commercial Molasses Corp. v. New York Tank Barge Corp., supra 314 U.S. at p. 109, 62 S.Ct. at p. 160.